

# SIGNET JEWELERS

# MASTER SUPPLIER MANUAL

**JEWELRY SUPPLIERS**
**WATCH SUPPLIERS**
**SPECIAL ORDER SUPPLIERS**
**DIAMOND DEPARTMENT SUPPLIERS**
and such other Suppliers who may become
Parties to this Master Supplier Manual

**(as may be amended by Signet from time to time)**

**January 2021**

**VERSION 20210101**

# CONTENTS

- o  INTRODUCTION       ………………………………………………………..6

SECTION 1: WORKING WITH SIGNET …….............................................................9
- o  WHO IS SIGNET       …………………………..……………………..……9
- o  VENDOR CONTACT FORMS    …………………………………………..9
- o  VISITING THE OFFICE    …………………………………………..……9
- o  SUPPLIER CODE OF CONDUCT   ……………………………………..10

SECTION 2: DIAMOND, GEMSTONE AND PRECIOUS METALS POLICIES …........14
- o  SIGNET RESPONSIBLE SOURCING PROTOCOL COMPLIANCE...……........15†
- o  CONFLICT DIAMONDS AND ILLICIT DIAMONDS, GEMSTONE
   AND PRECIOUS METALS TRADING...............................................17†
- o  GEMSTONE/DIAMOND ENHANCEMENTS, TREATMENTS AND
   COUNTRY OF ORIGIN       ………………………………………..18
- o  UNDISCLOSED LABORATORY-GROWN DIAMONDS PROHIBITION…….19
- o  ASSAY ……..........................................................................................19

SECTION 3: ANTI-MONEY LAUNDERING COMPLIANCE……………………………20
- o  ANTI-MONEY LAUNDERING COMPLIANCE UNDER THE USA
   PATRIOT ACT OF 2001 ……..................................................................21

SECTION 4: PRODUCT SPECIFICATION AND QUALITY REQUIREMENTS  ...........22
- o  PRODUCT LINESHEETS AND PIWS .................................................. 23
- o  QUALITY OBLIGATIONS       ...........................................................24
- o  SIGNET MERCHANDISE MANUFACTURING CONDITIONS
   AND REQUIREMENTS……………………………………………….....26
- o  CHILDREN'S JEWELRY REQUIREMENTS…………………………………29

SECTION 5: PURCHASE ORDERS    …...............................................................33
- o  PURCHASE ORDERS ……………………………………………………34
- o  ORDER SUBMISSION       ................................................................34
- o  EDI ORDER SPECIFICATIONS      ...............................................34†
- o  PURCHASE ORDER ACCEPTANCE      .......................................34
- o  TERMINATION OF AN ORDER ……….............................................35

SECTION 6: DELIVERY & PRESENTATION OBLIGATIONS   ................................37
- o  DELIVERY …........................................................................................38
- o  CUSTOMS AND IMPORTS ……………………………………………........38
- o  FREIGHT POLICY       ......................................................................41
- o  PRESENTATION       ........................................................................41

SECTION 7: SPECIAL ORDERS ...............................................................................42
- o  SURCHARGES AND GOLD POLICIES  ...............................................43
- o  SIZING POLICY  ................................................................................43
- o  LATE ORDER POLICY ......................................................................43
- o  SUPPLIER PERFORMANCE ...............................................................43
- o  CATALOGS ........................................................................................44

SECTION 8: LOOSE MEMO GOODS AND CONSIGNED MERCHANDISE ..................45
- o LOOSE MEMO GOODS REQUIREMENTS ..........................................46
- o CONSIGNED MERCHANDISE REQUIREMENTS ............................47
- o UCC FINANCING STATEMENTS ...................................................48
- o SUPPLIER REQUESTED RETURNS ………………………………………48

SECTION 9: PRICE & INVOICES ........................................................50
- o PRICE …..................................................................................51
- o PAYMENT...............................................................................51
- o INVOICE SUBMISSION ..........................................................52
- o INVOICE MATCHING ..............................................................52
- o STATEMENT OF ACCOUNT ...................................................52
- o PAYMENT DEDUCTIONS ........................................................52
- o CHARGEBACKS ……………………………………………………… 53
- o EDI INVOICE SPECIFICATIONS .............................................54

SECTION 10: DEFECTIVE AND RETURNED GOODS ...........................55
- o WARRANTY ...........................................................................56
- o NEW GOODS DEEMED DEFECTIVE ……………………………………56
- o GOODS THAT PASS INITIAL QUALITY CONTROL BUT ARE LATER DEEMED DEFECTIVE ..................................................56
- o CUSTOMER RETURN POLICY ................................................57
- o CUSTOMER OWNED REPAIR POLICY……………………………………57†

SECTION 11: MISCELLANEOUS ……..................................................58
- o COMPLIANCE WITH LAWS & INFRINGEMENT ..........................59
- o INDEMNIFICATION & INSURANCE .........................................59
- o TEST PRODUCT .....................................................................60
- o SHELF STOCK .......................................................................60
- o DISPLAY ALLOWANCE .........................................................61
- o CONTRIBUTIONS ..................................................................61
- o NEW STORE ALLOWANCE ……………………………..………………62
- o SELLING DIRECT TO CONSUMERS POLICY ……………………………62
- o CONFIDENTIALITY ...............................................................63
- o CONSEQUENTIAL DAMAGES ……………………………………………65
- o RELATIONSHIP OF THE PARTIES ...........................................66
- o SUCCESSORS AND ASSIGNS .................................................66
- o NO TRANSFER ......................................................................66
- o HEADINGS AND LEGEND ……………………………………………………66
- o NO FINDER'S FEE .................................................................66
- o SEVERABILITY .....................................................................67
- o NON-EXCLUSIVITY ……………………………………………………67
- o OWNERSHIP & LICENSING OF PRODUCTS…………………………………67†
- o SURVIVAL ............................................................................ 69
- o NO WAIVER ......................................................................... 70
- o REPRESENTATION BY COUNSEL & CONSTRUCTION .......................... 70
- o GOVERNING LAWS AND VENUE ............................................70
- o COUNTERPARTS, FACSIMILE AND  ELECTRONIC SIGNATURES .............70

APPENDICES ……………………………………………………………………………71
1) Sample Vendor Contact Form (VCF)  ………………………………………App 1
2) Signet Responsible Sourcing Protocol (SRSP)  …………………………………App 2 *
3) Signet Responsible Sourcing Protocol Compliance Report  …………………………App 3
4) Signet Responsible Sourcing Protocol Audit Guidance Manual  ……..……………App 4
5) Product Linesheet / PIW Requirements and Examples  ……………..…………App 5
   a) Product Linesheet Requirements ……………..…………………5(a)
   b) General Linesheet Instructions ……………………………………5(b)
   c) General Gold Linesheet ………………………………………5(c)
   d) General Silver Linesheet …………………………………………5(d)
   e) Bridal/Certified Solitaire Instructions ……………………………5(e)
   f) Bridal Linesheet ……………………………………………5(f)
   g) Certified/Solitaire Linesheet …………………………………5(g)
   h) Gold Gram Linesheet Instruction ……………..…………………5(h)
   i) Gold Gram Linesheet …………………….....…………………5(i)
   j) Stone and Metal PIW Guide …………………………………5(j)
   k) Non-Metal PIW Guide  …………………………………………5(k)
   l) Metal PIW Guide ……………………………………………5(l)
   m) PIW Search Instruction Guide ……………………………..…………5(m)
6) Findings Specifications  …………………………………………………App 6
   a) Signet Finding Specifications and Measuring Guides ……………6(a)
   b)  Pagoda Earring Standards …………………………6(b)
7) Signet Authorized Chain Vendors and Quality Specifications  ……..…………App 7
8) Vendor Measurement Guide…………………………………………… …..App 8
   a) Measurement Guide …………………………………………8(a)
   b) Signet Guidelines on Measuring Bolo Product ………………8(b)
   c) Measurement Guide for Bands ……………………………8(c)
9) Stamping and Setting Guidelines……………………………………………App 9
   a) Stamping Guidelines ………………………………….......9(a)
   b) Setting Guidelines ………………………………….......9(b)
10) Diamond Tolerance Ranges……………………………………………App 10 †
11) Metal Calculations…………………………………………………......App 11
12) Purchase Order Example………………………………………………App 12
   a) Akron PO Example ……………………………………12(a)
   b) Dallas PO Example …………………………………12(b)
   c) Purchase Order Coding Reference………………………12(c) *
13) EDI Trading Partner Guidebook…………………………………………App 13
14) North America Vendor Routing Guide ……………………………………App 14 *
15) Ticketing and Bagging Guidelines………………………………………App 15
   a) Ticketing and Bagging Guidelines …………………………15(a)
   b) Pagoda Product Tagging Guide ……………………………15(b)
   c) Zales Product Bagging Guidelines ………………………… 15(c) *
16) Blank W-9 Form…………………………………………………...........App 16
17) Electronic Payments……………………………………………………....App 17
   a) Vendor ACH Deposit Authorization……………………17(a)
   b) Electronic Payment Program Enrollment ………………………17(b)
18) Wire Payment Instructions Form………………………………..…………App 18
19) Signet's Diamond Standards and Laser Inscription  Guide…………………………App 19
   a) Signet's Diamond Standards Guide……………………………19(a) *
   b)  Signet's Diamond Laser Inscription Guide…………………..…19(b) *
20) Example Children's Product Certificate (CPC) Form ……………………..…………App 20
21) C-TPAT Business Partner Questionnaire …………………………………App 21 *
22) Pre-Qualification Due Diligence Questionnaire …………………………… App 22 *

LEGEND

\* Denotes that this section is entirely new or extensively different from what was in the previous Supplier Manual.

† Denotes that this section has been materially modified from how it appeared in the previous Supplier Manual. Material modifications are highlighted in yellow.

# INTRODUCTION

This Signet Master Supplier Manual ("Supplier Manual") introduces suppliers to the practices and procedures required by Signet's affiliate office in Akron, Dallas, and Canada with respect to the acquisition of any goods for retail sale by such Signet affiliate which shall include but is not limited to instances where a purchase order that relates to the goods either (1) was issued by Sterling Inc. or Sterling Jewelers Inc. (collectively "Sterling" or "Akron-based brands"); (2) was issued by Zale Delaware, Inc., Zale Corporation, or TXDC L.P. (collectively "Zale Delaware" or "Dallas-based brands"); (3) was issued by Zale Canada Co. ("Zale Canada" or "Dallas-based brands"); or (4) requested delivery to Signet's Akron or Canada distribution centers.  This Supplier Manual addresses (among other items) the following:

- Supplier Relationship
- Responsible Sourcing Requirements
- Product Specifications
- Purchase Orders

- Deliveries
- Special Orders
- Pricing & Invoices
- Returns and Repairs

This Supplier Manual contains the terms and conditions on which your organization ("Seller") will sell and Signet's affiliate(s) will purchase goods and, subject to any variations agreed in writing by an authorized Signet representative, such items, terms and conditions will govern all purchases from Seller. This Supplier Manual, as amended by Signet from time to time, is incorporated by reference into the Signet Vendor Buying Agreement (referred to herein as the "VBA" or "Signet's VBA").  The Supplier Manual and VBA shall collectively be referred to as this "Agreement".  In the event of conflicts among terms and conditions present in this Supplier Manual, a purchase order ("Order"), the VBA, or other agreements between the parties, the order of precedence unless otherwise specified shall be (i) licensing agreement(s), (ii) supply agreement(s), (iii) consignment agreement(s), (iv) non-disclosure agreement(s), (v) the Order, (vi) the VBA, (vii) this Supplier Manual as it may be amended by Signet or an affiliate from time to time, (viii) other written agreements.

This Supplier Manual presents process, policy and procedural information, but it is not intended to provide step-by-step instructions for every procedure involved in the buying process.  This Supplier Manual is confidential and is expressly for use by suppliers to Signet and its affiliates. Signet values its suppliers and recognizes the vital role they play in helping Signet to satisfy its customers' demands for quality products and service. Signet looks forward to building stronger and mutually beneficial partnerships with its suppliers.

Signet relies on the suppliers' full support in meeting the requirements of Signet's business and requests that each supplier ensures that all staff that support Signet's business are fully conversant with and will abide by its policies and procedures including those contained herein or in the VBA.

New initiatives to improve efficiency and meet the demands of Signet's customers and the market place will necessitate the review and update of practices and procedures in the future. Consequently, amendments to this Supplier Manual may occur from time to time.  Signet will send your organization notification via e-mail or other forms of communication regarding amendments to the Supplier Manual as they occur.  An updated version of the Supplier Manual may be requested from your Signet merchandise representative at any time.  Requested versions will be e-mailed at no charge, but Signet may charge your organization an administrative fee to cover its costs in supplying hard copies of the Supplier Manual.  By signing the VBA your organization agrees to comply with all provisions of this Supplier Manual and any subsequent updates and amendments, subject to any variations agreed in writing by an authorized Signet representative.

**VBA:**

**Please complete / update / sign and return the VBA (as a pdf document) to indicate that you have received this Supplier Manual, and that your staff have read it and will comply with the requirements and obligations set forth herein.  Any changes to the VBA may be made either manually or electronically but changes must be highlighted on the VBA for easy reference.  All changes will require approval by a Signet representative.**

**VCF:**

**Please complete all columns on the Vendor Contact Form ("VCF") with the most current contact information for your organization.  If anything has changed from what was provided in 2019, highlight the cells with the updated information and return it as an Excel document, along with the signed VBA, to your Signet representative.**

Sterling Jewelers Inc., Sterling Inc., Zale Delaware, Inc., Zale Canada Co., Zale Corporation, TXDC, L.P.  (collectively "Signet")                 January 2021

# Section 1

## WORKING WITH SIGNET

## WHO IS SIGNET

Signet is a wholly owned subsidiary of Signet Jewelers Limited and the parent company for Signet's U.S. operations.  Signet is the world's largest retailer of diamond jewelry.  Signet's UK division operates approximately 500 stores primarily under the name brands of H. Samuel and Ernest Jones. Signet's U.S. division, operates approximately 3,000 stores located in 50 states, including nationally recognized Kay Jewelers, Zales, Piercing Pagoda and Jared the Galleria of Jewelry.  Signet also operates approximately 175 stores in Canada primarily under the name brand Peoples Jewellers.  Shares of Signet Jewelers Ltd. are publicly traded on the New York Stock Exchange ("SIG").  This Supplier Manual references policies of Signet.  Such policies are also policies of Sterling Jewelers Inc., Sterling Inc., Zale Delaware, Inc., Zale Corporation, TXDC L.P., Zale Canada Co., and its affiliates and are therefore applicable to Sterling, Zale Delaware, Zale Canada, and its suppliers despite references to Signet instead of Sterling, Zale Delaware, or Zale Canada.

## VENDOR CONTACT FORMS

Signet requires its new suppliers to complete a Vendor Contact Form ("VCF"), which contains business and contact information.  Seller must immediately communicate any and all changes to information in Seller's most current VCF by either completing the relevant portions of a blank VCF or a pre-filled VCF and then submitting the VCF to sourcingservices@signetjewelers.com.  From time to time, Seller will also be required to confirm that Signet has the most up to date contact and business information by submitting a prefilled VCF and indicating either that no changes are required or communicating relevant changes accordingly.   A hard copy version of a blank VCF is attached as Appendix 1 for your reference and a VCF in MS Excel format will be sent from a Signet representative for Seller to complete annually.

## VISITING THE OFFICE

Signet's headquarters in Akron, Ohio, Dallas, Texas, or any other non-retail location, may be visited by appointment only.  Upon arrival to Signet's headquarters, visitors are required to stop at the security desk of the main entrance.  Visitors are required to register with security and will be issued a security pass with photo I.D. which must be worn in a visible position at all times while in the building.  Visitors must be accompanied by a Signet employee while in the building unless the pass issued by security indicates otherwise.  Signet operates security camera surveillance both within its offices and the local vicinity.

## SUPPLIER CODE OF CONDUCT

Signet has the objective to operate as a profitable and responsible specialty jewelry retailer, delivering increasing value to our shareholders, while seeking to uphold our Social, Ethical and Environmental Principles and considering the interests of our other stakeholders: customers, employees, those with whom we do business, and society as a whole.

In seeking to achieve our objective we recognize that there are indirect impacts generated by our activities, in particular through our supply chain. We will seek to use our influence with those with whom we do business directly, in particular our agents and suppliers, to promote the achievement of our Social, Ethical and Environmental Principles. As a customer we believe we have an opportunity to seek to influence the social, ethical and environmental performance of our suppliers in a positive manner. In order to do so it is necessary that our suppliers, and in turn their suppliers, should understand Signet's standards as set out in this Supplier Code of Conduct ("Code"). Therefore, we encourage suppliers to ensure that this Code is communicated throughout our supply chain.

### Our commitment to suppliers

Signet aims to pursue its business activities in what it considers to be an ethical and professional manner. Specifically and subject to the needs of its business, it aims to promote stable, sustainable, long-term relationships with its suppliers and other business partners. Signet intends to live by the principles of this Code within its own operations and has adopted Social, Ethical and Environmental Principles and policies to this effect.

### Legal compliance

Signet expects all its suppliers to comply with their national laws and regulations and to respect the fundamental International Labour Organization (ILO) conventions and the Universal Declaration of Human Rights. Where the Code or national law addresses the same issue, the supplier is expected, as a minimum, to be in compliance with the applicable legal requirements of the country in which it operates.

### Health & Safety

Signet expects its suppliers to provide a safe and healthy environment for their employees in accordance with applicable local laws and regulations. Appropriate procedures should be in place to prevent accidents and injury to health arising out of, linked with, or occurring in the course of work or as a result of the operation of employer facilities. Suppliers should be encouraged to have a nominated health & safety representative who monitors the facility's compliance with procedures.

Specifically suppliers should ensure that:
- Safe alternatives to the use of hazardous substances are adopted

- The use of cobalt discs is avoided

- Workers' eyesight is protected by ensuring the availability and use of appropriate magnifying tools when working on jewelry, diamonds and gemstones, and by providing appropriate lighting

- Workers are protected from repetitive strain injury as far as possible considering the ergonomics of their workplace

- Facilities have adequate ventilation from harmful fumes or dust

- Appropriate protective clothing is provided and use of protective clothing is ensured

- Facilities need to have adequate fire safety standards/procedures, including regular fire drills for all employees, appropriate firefighting equipment, and easily accessible, and marked and open fire exits in case of emergency

- Residential facilities for workers are kept safe and healthy in accordance with local laws and regulations

- Facilities should have easily accessible, adequate and clean bathrooms

- Potable water should be available at all times

- Where an infectious disease  is a significant issue in the supplier's location of operations, suppliers should educate workers about the risk of infectious diseases  and assist in providing access to treatment and medication as necessary.

**Remuneration**

Signet expects its suppliers to comply with local laws in respect of minimum wages, working hours, employee benefits and overtime.

**Working hours**

Suppliers are expected to comply with applicable local laws and industry standards on working hours. Suppliers should not, except in special circumstances or as permitted by local law, expect employees to work more than the lesser of:
- 48 hours per week

- The limits on regular hours allowed by local law.

Signet recognizes that those in management positions may exceed these limits in the course of carrying out their roles and responsibilities. Also, in light of the seasonal nature of business, Signet recognizes that suppliers' employees may be expected in special circumstances to work longer hours for relatively short periods of time. Where this occurs it should be in compliance with the regulations of the country of employment. Working hours exceeding 48 hours per week should be planned in a way to ensure safe and humane working conditions. Where the company is party to a collective bargaining agreement freely negotiated with worker organizations (as defined by the ILO) representing a significant portion of its workforce, it may require overtime work in accordance with such agreement to meet short-term business demand.

**Discrimination**

Signet expects that its suppliers will not discriminate on race, caste, origin, religion, disability, gender, sexual orientation, union or political affiliation or age.

**Harassment and abuse**

Signet expects that its suppliers will provide a safe workplace free from harassment, and they will not permit the use of monetary fines, corporal punishment or other forms of mental or physical abuse, coercion or intimidation.

**Forced labor**

Signet expects that its suppliers will not permit the use of any forced labor, whether in the form of prison labor, indentured labor, bonded labor or otherwise. Forced labor should be considered to include any work or service which is extracted from any person under the threat of penalty for its non-performance and for which the worker does not offer himself or herself voluntarily.

**Child labor**

Signet objects to the employment of persons younger than 15 years of age (or 14 where the law of the country permits) or younger than the age for completing compulsory education where this is greater than 15 in the relevant country. In addition, employers must comply with all their local legal requirements for young workers, particularly those pertaining to hours of work, wages, health and safety and general working conditions. A younger worker is defined as any worker over the age of a child as defined above and under the age of 18 years old.

Child labor should be phased out in a responsible manner that does not harm the welfare of the child and ensures that the child's right to health and education are met.

**Freedom of association**

Signet expects that its suppliers will not prevent employees and other workers from associating freely with any lawful workers' association or collective bargaining association. Where laws prohibit these freedoms, the supplier is encouraged to facilitate parallel means of association and bargaining.

**Environment**

Signet expects its suppliers to protect the Environment within their respective spheres of influence. This includes supporting initiatives to promote greater environmental responsibility along the entire jewelry supply chain as well as complying with relevant locally applicable environmental law and regulations.

More specifically Signet believes that natural resources should be developed in a manner that respects the needs of current and future generations. The jewelry industry uses metals and other minerals for a wide variety of purposes and it is therefore in the industry's best interest to ensure that the minerals upon which it depends are obtained, produced and used in environmentally and socially responsible ways.

**Ethics and integrity**

Signet expects that its suppliers will conduct business with integrity and communicate honestly regarding the nature of the products they supply, disclosing accurately their weight, color and

clarity, treatments of gemstones, the standard of fineness and trademarks of articles of precious metals and other matters as required by applicable federal, state and local laws and regulations.

**Gifts and Bribery**

Signet expects that its suppliers will not offer or provide gifts, gratuities or entertainment designed to induce, support or reward improper conduct in connection with any business or anticipated future business or where such gift, gratuity or entertainment might be seen or expected to compromise the receiver's judgment and integrity.

Likewise, Signet expects that its suppliers will comply with the requirements of the US Foreign Corrupt Practices Act and the UK Bribery Act in all its dealings, no matter where in the world. Such compliance includes prohibiting employees, officers, directors, agents, representatives, affiliates and their families from requesting, accepting, paying or offering any form of "under-the-table" payment, "kickback," bribe, rebate, or other improper payment or gratuity, whether directly or through a third party regardless of form, whether in money, property, or services (i) to obtain favorable treatment in securing business, (ii) to pay for favorable treatment for business secured, (iii) to obtain special concessions or for special concessions already obtained, for or in respect of either party or any affiliate of either party, or (iv) in violation of any legal requirement.

**Conflict Diamonds**

Signet and its trading subsidiaries fully support the Kimberley Process and require all our trade suppliers of diamonds and diamond jewelry to provide warranties in the form agreed by the World Diamond Council and/or Kimberly Process Certificates.

Invoices and packing slips for diamonds and diamond jewelry shipped to any trading subsidiary must contain a proper warranty statement or, if applicable, be accompanied by a Kimberly Process Certificate.  Please refer to the appropriate trading subsidiary's Supplier Manual for the warranty statement and other specific requirements.

**Monitoring**

Suppliers are encouraged to institute a self-monitoring system based on this Code and are expected to comply with any and all requests from Signet for verification, including independent third party verification, of Code compliance.

**Communication**

Suppliers are encouraged to take appropriate steps to ensure the provisions of this Code are communicated to their employees and their own supply chain. Suppliers are also encouraged to ensure that the Principles referred to above are adopted and applied by their employees, suppliers, agents and contractors so far as reasonably possible.

By signing Signet's VBA, Seller agrees to comply with the Code as amended by Signet from time to time.

# Section 2

**DIAMOND, GEMSTONE AND PRECIOUS METALS POLICIES**

# SIGNET RESPONSIBLE SOURCING PROTOCOL COMPLIANCE[1]

Signet Jewelers Limited and our US, Canada, and UK operations are fully committed to the responsible sourcing of our products and the respect of human rights, and we expect the same from our suppliers around the world. We continually strive to assure our customers, employees, investors and other stakeholders that our supply chain avoids action that may directly or indirectly finance armed conflict and serious human rights violations around the world including the Democratic Republic of Congo and its adjoining countries.

Signet has been at the forefront of responsible sourcing in the jewelry supply chain. Signet is a Founding and Certified Member of the Responsible Jewellery Council (RJC), an organization that is committed to promoting responsible ethical, human rights, social and environmental practices throughout the jewelry supply chain. As a Founding Member and active participant, we fully support the RJC's membership Code of Practices and Chain of Custody standards.

Signet is also active in cross-sector coalitions and working groups that reach beyond the jewelry industry to ensure that companies respect human rights and avoid contributing to armed conflict. Signet supports the Organisation for Economic Cooperation and Development (OECD) due diligence guidelines supplement for gold, the London Bullion Market Association (LBMA) Responsible Gold Guidance, and the Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 1502, relating to our supplies of gold.

Based on these international standards and guidance, we conducted extensive research and consulted with many of our suppliers to develop the Signet Responsible Sourcing Protocol (SRSP). The SRSP for 2020 is attached as Appendix 2. The objectives of the SRSP is to: 1) outline practical procedures that will reasonably ensure any gold, tin, tungsten or tantalum ("3Ts" or collectively with Gold "3TG"), defined as "conflict minerals" by the United States Securities and Exchange Commission (SEC), in products supplied to Signet are recognized as conflict-free and 2) provide transparency and to assure that all Signet diamonds, silver and platinum group metals ("PGMs"), colored gemstones and laboratory-grown diamonds are sourced through identified and verified sources, over time, through a process of continuous improvement. The SRSPs were established as company policy effective 1/1/2013 for Gold and 3Ts, 1/1/2016 for Diamonds and 1/1/2017 for silver and PGMs, 1/1/2019 for colored gemstones and 1/1/2020 for laboratory-grown diamonds. The SRSPs require, over time and through a process of continuous improvement, all suppliers to certify and independently verify that supplies to Signet are compliant with the SRSPs.

Seller is required to be proactive in obtaining information from its own supply chain in order to comply with the SRSPs. By signing Signet's VBA, Seller agrees:

1. To comply with the conflict-free sourcing requirements of the SRSP as amended by Signet from time to time.

---

[1] The cornerstone of compliance with the SRSPs is a requirement that Seller report to Signet annually that Seller is sourcing materials supplied to Signet responsibly and in conformance with the requirements of the SRSP. Please refer to the SRSPs documents attached hereto for additional SRSP compliance criteria and requirements, which include but are not limited to: adding the SRSP warranty statement on all invoices and delivery notes, maintaining information and documentation that evidence the due diligence indicated in the reports and periodically having an independent third party audit of the annual report and supporting documentation.

2. That if Signet, or a third party acting on Signet's behalf, submits a SRSP compliance report (or a link to an online SRSP compliance report) to any email or physical address on Seller's Vendor Contact Form ("VCF") or a previous SRSP compliance report, then Seller must complete and return that SRSPs compliance report within 45 days and provide any supporting documents that Signet may request.  Seller must complete a SRSP compliance report for all goods Seller delivered, will deliver or expects to deliver to Signet during the calendar year the compliance report was submitted to Seller.  Seller may amend or supplement its SRSP compliance report to correct any mistakes and/or add any new information, but Seller must do so by no later than January 15 of the subsequent year. Please reference the training resources on the Signet Responsible Sourcing SRSP Toolkit for instructions and guidance on completing the annual SRSP compliance report.  Seller must complete SRSP compliance report(s) in accordance with this subsection [4] regardless of whether or not Seller supplies goods to Signet that contain diamonds, gold, tin, tantalum, tungsten, silver, or platinum group metals.

3. That if Seller knows or has reason to believe or if Signet has reason to believe that Seller has delivered gold, tin, tantalum or tungsten (collectively, "Conflict Minerals" as defined in SEC Release No. 34-67716) to Signet that may have originated in the Democratic Republic of Congo or an adjoining country (collectively, "Covered Countries" as defined in SEC Release No. 34-67716), Seller will provide Signet:

    a. a description of the measures Seller has taken to exercise due diligence on the source and chain of custody of those "Conflict Minerals"
    b. a description of the measures Seller has taken to mitigate the risk that any "Conflict Minerals" delivered to Signet benefited armed conflict.
    c. a description of the facilities used to process those "Conflict Minerals"
    d. the country of origin of those "Conflict Minerals"
    e. the efforts to determine the mine or location of origin with the greatest possible specificity.

4. To maintain complete and accurate records that can be used to verify each SRSP compliance claim made by Seller for a period of five years as described below.  Signet may, at its option, require Seller to validate an SRSP compliance claim by requiring Seller to obtain, at Seller's expense, an independent third party audit of such claim from an SRSP accredited auditor and provide Signet with a copy of the auditor's report or report summary.  Signet has the right to require an independent third party audit of any compliance claim(s) made by Seller for a period of five years from the end of the calendar year to which the records or claim relate.  A copy of the 2019 SRSP Audit Guidance Manual is available as Appendix 4 of this Supplier Manual and may be amended from time to time.  2020 Audit guidance for the SRSP will be made available in the fall of 2020 in time for the calendar year 2020 reporting cycle.  Sellers that are certified members of the Responsible Jewellery Council (RJC) with a Provenance Claim for all relevant items and where the certification covers all entities in Seller's supply chain in accordance with the SRSP will not be subject to regular SRSP audits.  Notwithstanding the preceding sentence, Signet reserves the right to require an SRSP audit(s) if, in Signet's sole discretion, Signet deems it necessary or prudent.

5. Seller will, after reporting compliance with the SRSP by completing the compliance report referenced in subsection [4] above, include the SRSP warranty statement on all invoices and supporting documentation such as delivery notes – even invoices for goods that do not contain precious metals nor diamonds, if any.  If Seller delivers goods without the proper warranty statement documentation, the product will either be 1) held until the proper documentation is obtained or 2) be returned to Seller at Seller's sole cost and expense, such determination to be made by Signet.  At Signet option, multiple infractions regarding this documentation policy may result in either fine(s) being levied or the discontinuing of business with Seller.  The SRSP warranty statement is:

> *"The seller warrants that these products have been supplied in compliance with the Signet Responsible Sourcing Protocol ('SRSP')."*

6. To include the requirements of the SRSP and this SRSP compliance section of the Supplier Manual, including this subsection [9] flow down requirement, in all subcontracts entered into by Seller for the supply of metals, materials, components or finished goods that are supplied to Signet by the Seller.  Verification of such flow down requirements is also subject to the audit requirements in subsection [6] above.

7. If applicable, to comply with the requirements of the final rule of the Security and Exchange Commission on Conflict Minerals as set forth in 17 CFR §240.13p-1, §249b.400, and SEC Release No. 34-67716 dated August 22, 2012 (SEC Final Rule).

## CONFLICT DIAMONDS AND ILLICIT DIAMONDS, GEMSTONE AND PRECIOUS METALS TRADING

### CONFLICT DIAMONDS

One of the issues facing Signet and the diamond sector is conflict diamonds. These are diamonds sold by rebel movements to fund military campaigns. Signet has worked with industry members, the United Nations, governments, and civil society to introduce an effective system for the certification of the source of uncut diamonds. This system, known as the Kimberley Process Certification Scheme (KPCS), was formally adopted in November 2002 and implemented during 2003 (www.kimberleyprocess.com). The WDC has also introduced a System of Warranties for the trade in polished diamonds whereby the seller confirms that the diamonds comply with the KPCS (www.diamondfacts.org). Signet has trained its buying staff and sales associates with regard to the KPCS and the WDC System of Warranties requirements and operation. The audit of these procedures as required by KPCS is undertaken regularly, and the audit results have confirmed Signet's compliance.

The System of Warranties introduces a chain of warranties that follows rough diamonds, polished diamonds, and diamond jewelry through the supply chain. It requires that every time diamonds – loose or set in jewelry – change hands, the seller will affirm on the invoice that they were obtained from legitimate sources.  Using the following warranty statement developed by the World Diamond Council, Signet requires that this statement appear on all invoices to Signet:

> *Any natural diamonds herein supplied have been purchased from legitimate sources not involved in funding conflict and in compliance with United Nations Resolutions and corresponding national laws.  The seller hereby guarantees that these natural diamonds are conflict free and confirms adherence to the WDC SOW Guidelines.*

Vendors that sell loose diamonds or other goods containing diamonds to Signet are required to include the warranty statement on all invoices – even invoices for goods that have no diamonds.  If Seller supplies loose diamonds or other goods containing diamonds to Signet, and Seller invoices Signet for merchandise without the warranty statement appearing on the invoice, the product will either be 1) held until the proper documentation is obtained or 2) be returned to Seller at Seller's sole cost and expense, such determination to be made by Signet.  At Signet's option, multiple infractions regarding this documentation policy may result in either fine(s) being levied or the discontinuing of business with Seller.

**ILLICIT DIAMONDS, GEMSTONES AND PRECIOUS METALS TRADING**

Similarly, Signet demands that its suppliers work closely with their own suppliers to ensure that Signet's suppliers do not knowingly purchase diamonds, gemstones and/or precious metals from sources whose dealings may include those who are criminals or terrorists, even if those diamonds are in compliance with the KPCS and applicable United States laws and sanctions or Canadian laws or treaties.

By signing Signet's VBA, Seller agrees:

1. To not knowingly sell illicit diamonds, gemstones and precious metals, and
2. To undertake reasonable measures (including support of KPCS and Clean Diamond Trade Act) to help prevent the sale of illicit diamonds, gemstones and precious metals in the United States.
3. That by shipping goods pursuant to a Purchase Order, Seller warrants that, to the best of Seller's knowledge, the diamonds invoiced have not originated from the Marange region of Zimbabwe and Seller has received a similar assurance of non-Marange origin from any supplier from whom Seller has obtained the diamonds invoiced.

## GEMSTONE/DIAMOND ENHANCEMENTS, TREATMENTS AND COUNTRY OF ORIGIN

Seller must not supply goods to Signet that contain:

- Gemstones or diamonds that are irradiated, in a nuclear reactor or linear accelerator, unless a separate written irradiation agreement is signed in advance by an authorized Signet representative and all regulatory compliance, documentation and audit requirements of that separate agreement are maintained by Seller;

- Gemstones or diamonds that are enhanced by vapor deposition, a process when a gaseous metal is deposited on the surface of a stone (e.g. white topaz). This is commonly called "Mystic Ice" or "Mystic Topaz;"

- Manufactured or Composite corundum or beryl as defined by the GIA. Should you need additional information, please reference www.gia.edu;

- Diamonds that are laser drilled, clarity enhanced, coated, treated in any way including HPHT (high pressure - high temperature);

- Re-constituted Turquoise, Onyx, and Jade: has little to no natural stone, made entirely from resins and dyes;

- Rubies or Jadeite that are of Burmese/Myanmar origin;

- Any parts or items made by North Korean citizens, nationals, or entities;

- Lapis Lazuli;

- Coral;

- Ivory.

Accordingly, by signing Signet's VBA, Seller warrants to:

1. not supply Signet gemstones or diamonds that meet any of the above criteria, and
2. undertake reasonable measures to ensure that Seller's suppliers do not supply gemstones or diamonds that meet any of the above criteria in products that are later supplied to Signet.

## UNDISCLOSED LABORATORY-GROWN DIAMONDS PROHIBITED

Seller shall not supply goods to Signet that contain undisclosed laboratory-grown diamonds. By signing Signet's VBA, Seller warrants that diamonds that have been or will be supplied to Signet are exclusively of natural origin and have not been created or treated using CVD, HPHT, or any other man-made process. For more information, refer to Appendix 2c Signet Responsible Sourcing Protocol – SRSP Diamonds Appendix.

## ASSAY

Signet will conduct periodic assays of merchandise for appropriate content of metal (plating thickness, karat, etc.), gemstone and diamonds to ensure that such merchandise complies with Signet's requirements and this Supplier Manual, which includes but is not limited to, country of origin. The purpose of the assays is to ensure that the product delivered to our consumer and any accompanying representation relating to metal and gemstone content of such product complies with the prescribed Federal Trade Commission (FTC) regulations and this Supplier Manual. Signet requires strict adherence with respect to the FTC metal and gemstone content regulations and this Supplier Manual.

Seller is required to establish and maintain necessary procedures and precautions that will ensure all goods supplied to Signet by Seller meet or exceed the prescribed gemstone, metal and country of origin requirements. Any and all costs associated with the assaying of goods, such as a $27.50 per item testing fee, shall be assessed to Seller, including the cost of the individual piece assayed. Any piece or remnants of a piece that is assayed may be returned to Seller at Seller's sole cost and expense.

If a piece fails assay, any and all items of the same style # or SKU that were part of the same Order or lot or related Order or lot will be returned to Seller for credit which will also include the cost of freight and packaging of such items for the return. Each item that fails assay is subject to a $5,000 chargeback as liquidated damages as Seller acknowledges that Signet may incur damages, costs or lost profits, which may be difficult or impossible to calculate, that result directly from an assay failure and/or the return of any items that were part of the same Order or lot.

Additionally, if an assay failure or a series of assay failures causes Signet, in its sole and absolute discretion, to take action with regard to goods from Seller that are not part of the same Order or lot as the item(s) that failed assay, Seller will also be responsible for any and all recalls or other damages, costs or lost profits that Signet incurs as a result of those further actions, and Seller agrees to indemnify Signet for any and all such recalls or other damages, costs, or lost profits.

Repeated assay failures will likely necessitate a suspension of orders until Seller institutes sufficient procedures and precautions to prevent future assay failures.

Further, all remedies, rights, responsibilities and obligations of Seller and Signet in this subsection shall also be valid and enforceable notwithstanding the fact that an assay failure was discovered by Signet outside of the standard periodic assay process (e.g. through quality assurance procedures).

# Section 3

## ANTI-MONEY LAUNDERING COMPLIANCE

# ANTI-MONEY LAUNDERING COMPLIANCE UNDER THE USA PATRIOT ACT OF 2001

Recognizing the need for more comprehensive anti-money laundering regulations, Congress passed, and the President signed into the law, the USA PATRIOT Act of 2001, which, among other things, requires that all persons defined as financial institutions for Bank Secrecy Act purposes establish anti-money laundering programs. The Act further directs the Secretary of the Treasury to prescribe through regulation minimum standards for such programs. A dealer in jewels, precious metals, or precious stones is defined as a "financial institution" under the Bank Secrecy Act.

The Financial Crimes Enforcement Network (FinCEN) is the bureau of the U.S. Department of the Treasury charged with combating money laundering, terrorist financing and financial crimes. FinCEN issued the Interim Final Rule ("Interim Final Rule") implementing the relevant provisions of the USA PATRIOT Act of 2001, which was codified at 31 C.F.R. Part 103 (reorganized in 2011 as 31 C.F.R. Chapter X). Consequently, beginning January 1, 2006, all dealers in jewels, precious metals, or precious stones were required to establish and implement anti-money laundering programs.

The Interim Final Rule defines a "dealer" in relevant part as: a person engaged within the United States as a business in the purchase and sale of covered goods (i.e., precious metals, precious stones, jewels, or finished goods deriving more than 50% of their value from precious metals, precious stones, or jewels) and who, during the prior calendar or tax year:

    A. Purchased more than $50,000 in covered goods; and
    B. Received more than $50,000 in gross proceeds from the sale of covered goods

According to the Interim Final Rule and guidance issued by FinCEN, at a minimum, dealers must establish an anti-money laundering program that includes these four elements:

    1. Policies, procedures, and internal controls, based on the dealer's assessment of the money laundering and terrorist financing risk associated with its business, that are reasonably designed to enable the dealer to comply with the applicable requirements of the Bank Secrecy Act and to prevent the dealer from being used for money laundering or terrorist financing.
    2. A compliance officer who is responsible for ensuring that the program is implemented effectively.
    3. Ongoing training of appropriate persons concerning their responsibilities under the program.
    4. Independent testing to monitor and maintain an adequate program.

By signing Signet's VBA, Seller acknowledges:

    1. having read and becoming familiar with the Interim Final Rule
    2. compliance with applicable portions of the Interim Final Rule, and
    3. status as a "dealer" as defined by the Interim Final Rule.
    4. seller must sign any documentation required or requested by Signet to verify compliance with the Interim Final Rule.

# SECTION 4

## PRODUCT SPECIFICATION AND QUALITY REQUIREMENTS

## PRODUCT LINESHEETS AND PIWS

When supplying a product that has not previously been supplied to Signet, Seller must complete the appropriate Product Linesheet for goods to be supplied to Akron-based store brands or Product Information Worksheet ("PIW") for goods to be supplied to Dallas-based store brands and promptly return it to a Signet representative.  Seller shall ensure that the Product Linesheet or PIW provides Signet with all information applicable to the respective product or that may be requested from Signet from time to time.  Each individual product must have its own unique Product Linesheet or PIW.  Goods will not be accepted into Signet's distribution center unless Signet is in receipt of a complete and approved Product Linesheet or PIW for said goods.

Signet will send a blank Product Linesheet to the seller for Akron-based brands.  For Dallas-based brands the seller will be provided access to the Product Information Worksheet ("PIW") via the Vendor Portal.   The Vendor Portal is located at http://supplychain.zalecorp.com.  The seller will need to create a new account to gain access.

Steps for creating a new account are as follows:
1. Contact the Vendor Portal Team by e-mailing at SourcingServices@signetjewelers.com
2. You will need to provide your Zale Vendor Number, Name, Phone Number, and e-mail address
3. You will receive your username and password in an e-mail
4. Log in and visit the Training tab to complete mandatory application training in order to access full functionality in the Signet vendor website portal.

It is Seller's responsibility to ensure that the Product Linesheet or PIW is completed fully and Seller represents that the information on the Product Linesheet or PIW is true and correct and does not include any omissions as it forms a critical part of the description of what exactly is being supplied. The list of Product Linesheet and PIW appendices are as follows:

- Product Linesheet Requirements are attached as Appendix 5(a)
- A guide to PIWs for general items is attached as Appendix 5(b)
- A blank Product Linesheet for general product is attached as Appendix 5(c)
- A blank Product Linesheet for silver pennyweight product is attached as Appendix 5(d)
- A guide to PIWs for bridal/certified bridal items is attached as Appendix 5(e)
- A blank Product Linesheet for bridal/certified bridal product is attached as Appendix 5(f)
- A blank Product Linesheet for solitaire/certified solitaire product is attached as Appendix 5(g)
- A guide to PIWs for gold gram items is attached as Appendix 5(h)
- A blank Product Linesheet for gold and silver gram product is attached as Appendix 5(i)
- A guide to PIW for creating a PIW for a stone and metal item as Appendix 5(j)
- A guide to PIW for creating a PIW for a non-metal item as Appendix 5(k)
- A guide to PIW for creating a PIW for a metal item as Appendix 5(l)
- A guide to PIW for creating PIW activities as Appendix 5(m)
- A guide to PIW metal calculation, labor per piece, and incremental labor as Appendix 5(n).
- A guide to PIW for Dallas-based brand Pagoda as Appendix 5(o)

Accurate, representative color photograph(s) of the relevant Product should be attached to the Product Linesheet whenever possible.  Information contained on Product Linesheets or PIWs must be agreed between Signet and Seller, and signed by an authorized Signet representative. Information contained on PIWs must be agreed and approved by Signet in the portal.

Signet reserves the right to recover any costs or losses incurred due to incorrect or inaccurate statements made by Seller on any Product Linesheet or PIW.

Changes or revisions to the cost, price, or the product specification or design are not permitted, effective or enforceable unless Seller completes a new Product Linesheet or PIW that is approved and signed by an authorized Signet representative in advance of goods that are subject to said changes/revisions being accepted into any of Signet's distribution centers and may require a new SKU.

Please direct inquires to the appropriate functional area as listed in the chart below:

| Requests | Responsible Department | Contact Information |
|---|---|---|
| PAC questions, payment questions, invoice questions | AP | ProcessServices@signetjewelers.com |
| Changes to vendor's bank information | AP | Please use email/fax provided on banking form |
| Merchandise chargeback details | AP | ProcessServices@signetjewelers.com |
| Freight Chargeback details or inquiries | Transportation | Deborah.Taylor@signetjewelers.com |
| Vendor requests for any legal documents | Legal | Julie.Perkins@signetjewelers.com |
| Chargeback questions - reason for chargebacks | Merchandising | applicable merchant |
| Questions concerning vendor RTV | Merchandising | applicable merchant |
| Changes to vendor's company address, RTV address | Merchandising | Vendor to submit new VCF to applicable merchant |
| Questions regarding merchandise | Merchandising | applicable merchant |
| Vendor's / request to reset password, change password | IT | Seller to request through Signet portal |
| Vendor's request to add new user to vendor portal account, link vendors to existing user (applicable only for Dallas-based store brands) | Sourcing | SourcingServices@signetjewelers.com |
| Basic PIW questions - how to create PIWs, etc (applicable only for Dallas-based store brands) | Sourcing | SourcingServices@signetjewelers.com |
| Merchandise Memo Sales reports available at beginning of month (applicable only for Dallas-based store brands) | Reports Tab of My Z | |

# QUALITY OBLIGATIONS

All goods that Seller delivers to Signet, including goods that are replacement parts or have been repaired, must:

Conform in all respects with the quality, design, functionality, description, specifications, sourcing, warranties, and standards referred to in this Supplier Manual including but not limited to the Signet Merchandise Manufacturing Conditions and Requirements set forth below, the relevant Product Linesheet, PIW, the Purchase Order and any other document provided to Seller and Seller further represents and warrants to Signet the goods;

Have the same appearance and quality as the relevant Sample of that Product;

24

Be fit for any purpose for which they are commonly supplied or used and for any purpose indicated in any Product Linesheet, PIW or Purchase Order;

Be safe and without risk to health or property;

Be of high quality and be free from defects in design, materials or workmanship;

Include all necessary information about the use of the Products and all instructions and warnings relating to the Products as may be necessary for the safe and lawful use of the Products;

Comply with all other relevant laws, regulations, orders, rules, codes and standards that may be in force in the United States and Canada from time to time including but not limited to: the National Gold and Silver Stamping Act; Canadian Precious Metal Marking Act; the Federal Trade Commission (FTC) Guides for the Jewelry, Precious Metals and Pewter Industries; California's Metal-Containing Jewelry Law; the Consumer Product Safety Improvement Act; and all applicable federal, state and local restrictions on the presence of Lead, Mercury and other hazardous materials regardless of whether the items are marketed for children or adults;

Be cadmium free (for the avoidance of doubt, solder must be cadmium free) unless a separate written cadmium agreement is signed in advance by an authorized Signet representative and all regulatory compliance, documentation and audit requirements, if any, of that separate agreement are maintained by Seller;

Not have a battery that contains mercury.  All goods that contain batteries that Seller supplies to Signet are required to be mercury free.  SKU descriptions included on a Purchase Order do not state "0%HG" (Hg being the elemental symbol for mercury), but Seller must still supply mercury free goods;

Be certified in compliance with the limits of California Proposition 65 and the Consumer Product Safety Commission.  If Seller supplies goods containing enamel, or elements of jewelry that could contain lead, Seller will need to provide testing on a yearly basis from one of the authorized facilities located within the United States.  To locate authorized testing facilities within the United States, refer to the following website: http://www.cpsc.gov/cgi-bin/labsearch/; and

Be in compliance with the California Metal-Containing Jewelry Law.  If Seller supplies goods that are: Children's Jewelry (as defined below), piercing jewelry, or that contain any Class II or Class III materials as defined under the California Metal-Containing Jewelry law (collectively "California Statement Goods"), Seller must certify that such goods are in compliance with California's Metal-Containing Jewelry Law by conspicuously including the statement below on all invoices that have California Statement Goods. Seller may, but is not required to, include the below statement on invoices that do not contain California Statement Goods.  The conspicuous statement below can be in the form of a stamp, sticker, or pre-printed statement on the face of the invoice.

> *Seller herby certifies that the jewelry described herein does not contain a level of lead or cadmium that would prohibit the jewelry from being sold or offered for sale pursuant to Article 10.1.1, Chapter 6.5, Division 20, of the California Health and Safety Code [Sections 25214.1 – 25214.4.2].*

All loose and mounted diamonds must, regardless of size, shape, asset or memo, meet the attributes for specific diamond qualities, the acceptable characteristics within those qualities and Signet's standards for MM sizes, ratios and cut proportions as described in Signet's Diamond Standards Guide attached as appendix 19(a) and Signet's Diamond Laser Inscription Guide attached as appendix 19(b); incorporated by reference into the VBA and this Supplier Manual.

Goods that do not conform to these quality obligations will not be accepted.  Signet reserves the right, at its sole discretion to return goods to Seller that do not conform to said obligations at any time and at Seller's sole cost and expense which includes shipping, handling and any other damages

or expenses that might be incurred by Signet.  In addition, at Signet's sole discretion, goods that are rejected by Signet for a failure to meet any of these quality obligations will result in a liquidated damages chargeback to Seller of $2.00 per unit rejected in the United States or Canada.

## SIGNET MERCHANDISE MANUFACTURING CONDITIONS AND REQUIREMENTS

1.  Items sold as castings, machine made chain or stamped merchandise will be allowed a 5% tolerance under or over the original quoted weight.

2.  All finished rings must comply with a minimum of 1.0MM (depth) by 1.0MM (width) shank dimension

3.  Ladies' ring stock size is 7, Gents ring stock size is 10 with a ¼ size tolerance plus or minus. Ring stock tolerances:  Ladies' must be a minimum of 6 ¾ and no larger than size 7 ¼.  Men's minimum of 9 ¾ and no larger than 10 ¼.  Ring sizes other than the stock size must be specified on the Product Linesheet or PIW.

4.  Pre-plating of sterling silver product must be done in accordance with one of the two processes listed below prior to applying the final rhodium plating.

    1.  **Fine silver, no more than 2.0 micron**
    2.  **Palladium, .15 micron**

    Total plating thickness must not exceed 7.0 micron.

5.  If supplying product with findings, Seller is required to enter the DWT on the Product Linesheet or gram weight on the PIW in the finding field. The weight of the finding will be entered into Signet's system and lock with the daily metal lock (this will work in the same manner that the casting metal locks).

    Earring finding such as post, or earring back (friction, screw backs, ear nuts, and lever backs) will need to meet standard size requirements.   Please reference the Signet Findings Specifications attached at Appendix 6(a) or, if your good(s) are for Dallas-based brand, Pagoda, as indicated in an applicable PIW, then use Pagoda Earring Standards and Internally Threaded Cartilage attached at Appendix 6(b), which includes the dimension and tolerances of each finding.

    All of these findings can be purchased through Leach Garner, by contacting Linda Coutu at lcoutu@leachgarner.com.   However, if Seller chooses to manufacture or purchase these findings from another supplier, they **must** meet the dimensions in Appendix 6.

6.  If supplying products requiring a chain, Seller is required to use a Signet authorized chain vendor with fixed pricing. Please contact Tiffani Fultz, Tiffani.Fultz@signetjewelers.com, for a complete listing of styles and pricing available from the authorized vendors and/or refer to the Signet Authorized Chain Vendors and Quality Specifications attached at Appendix 7. Suppliers may use other sources for styles not found on the authorized chain vendor listing, however all chain supplied must adhere to Signet's Chain specifications (also available in Appendix 7).  Gold suppliers may choose to use their own chain but must adhere to Signet's chain specifications (5.5mm spring ring, or lobster clasp and quality tag).

7. All bracelets must be a minimum of 7" in length when clasped, unless otherwise noted. Findings, which insert themselves inside the bracelet, are not included with the 7" requirement. Please reference Signet's Measurement Guide attached at Appendix 8 for specifics on measuring bracelets, necklaces, pendant chains, and bands.

8. Items supplied to Signet containing rose gold must comply with Signet's rose gold formula tolerances. These tolerances are sometimes referred to as "American Rose Gold", and are:

| Karat | Min Gold % | Silver and Zinc% | Copper% |
|-------|-----------|------------------|---------|
| 14k | 58.33% | 2.78% to 4.20% | 36.53% to 38.72% |
| 10k | 41.67% | 3.20% to 14.20% | 42.75% to 56.82% |

9. Items supplied to Signet containing platinum may not use cobalt as part of an alloy mixture unless otherwise approved in writing by a Signet representative.

10. Each piece of merchandise must have karat gold, platinum, sterling silver, titanium or stainless steel stamp and Seller trademark. Earring castings or posts and backs must be stamped with karat stamp and Seller trademark. See stamping guidelines attached at Appendix 9.

   - Per R.S.C., 1985, c. P-19, Canadian Precious Metal Marking Act, and 15 U.S.C.A. § 297, U.S. Stamping Plated Articles Act, articles stamped with a quality mark like "14KT" or "PLAT" must generally, within close proximity, be stamped with the manufacturer's registered trademark. The actual mark stamped must be a registered trademark (or the manufacturer must have applied for and be pursuing registration) in the respective country where the merchandise is sold to consumers. Consequently, if the articles are sold in the United States and Canada, the stamped mark must be registered in both countries.

11. Imported gold chains must be stamped with metal content and country of origin. All other imported goods must be tagged with country of origin and state the country of origin on the invoice. See stamping guidelines attached at Appendix 9.

12. At its sole discretion, Signet reserves the right to exercise a return for full credit of both saleable and/or customer returned merchandise that is composed of contemporary metals such as titanium, tungsten, stainless steel, cobalt and sterling silver.

13. Seller agrees to accept single unit Orders requiring alternate color gold. Signet does not charge its customers for merchandise requested in alternate color gold, and will not accept additional charges from Seller for goods ordered in alternate color gold. Orders requiring alternate color gold are considered Special Orders and are subject to the provisions contained within the Special Order section of this Supplier Manual.

14. Signet's Diamond Department must approve the quality standards of diamonds and color stones used in goods, and Signet's manufacturing team must approve diamond and color stone pricing before orders of those goods are delivered to Signet (including consignment merchandise).

   A. Loose diamonds or diamonds contained in goods delivered to Signet must:

   - Comply with the "Diamond Tolerance Ranges" chart attached at Appendix 10. Diamond weights will be stated in fractions with the said diamond tolerances, merchandise will be paid to Seller based on the bill weight.

- Conform to maximum allowable variance per unit of (= or -) 10% in diamond count as compared to the Product Linesheet or PIW for goods that contain more than 10 baguette cut diamonds per unit.

- Not be laser drilled, clarity enhanced or treated in any way including HPHT (High Pressure - High Temperature) unless prior written approval is given to Seller by an authorized Signet representative.

- Not be synthetic, laboratory-grown, created or "cultured" diamonds.

- Be completely closed on the surface and not have open breaks or indented naturals or any type of indentation that can be perceived as a chip or a break by the retail consumer.

    a) An open break is any opening occurring from an imperfection reaching the surface and creating a crevice or a hole that can be perceived as a chip or a break.  Open breaks can also be a feather that reaches the surface or a pit or cavities.

    b) An indented natural is an indentation in the natural skin left behind after polishing a diamond.  These indentations are often perceived as chips or breaks and are therefore unacceptable.  Naturals are acceptable when they are smooth and appear to be an extra facet if said naturals are confined to the girdle pavilion area of a diamond.

- Not contain or exhibit heavily concentrated dark included crystals easily visible to the naked eye.

B.  Signet's Diamond Department requires all suppliers of diamonds and color stones to supply a document (manifest) that details the contents for each package they ship to Signet.  This document (manifest) must **list** on it **each invoice or memorandum number** as well as the purchase order number that is enclosed in the package.

**NOTE:** Failure to comply with this policy will result in Signet not being held liable for any missing merchandise in the package and the return of such package at Seller's sole expense.

15. Signet may return diamonds that fall below Signet's standards to Seller at anytime at Seller's sole expense including freight.

16. If Signet supplies diamonds to Seller, any breakage must be reported to the Signet Diamond Department.  Signet will replace the diamond(s) and charge Seller for the expense of the replacement diamond(s) and shipping. Seller, at its own expense, must return broken diamonds to Fairfax Distribution, 375 Ghent Road, Akron, OH 44333 or the Canadian Distribution Centre in Toronto, Canada.

17. If Signet supplies color stones to Seller, any breakage must be reported to the Signet Loose Color Department.  Signet will replace up to 3% of the total order at no charge (5% of the total order for broken opal or emerald stones).  The expense of any breakage over the allowed percentage will be charged to Seller and must be paid before Signet will ship replacement

stones to Seller.  Seller, at its own expense, must return broken stones to Fairfax Distribution, 375 Ghent Road, Akron, OH 44333 or the Canadian Distribution Centre in Toronto, Canada.

## CHILDREN'S JEWELRY REQUIREMENTS

The following children's jewelry requirements apply to all goods that Seller suppliers to Signet that are targeted at or intended primarily to be worn or purchased by a person in the United States that is 12 years of age or younger (17 years or younger in Canada) ("Children").

Seller must comply with all applicable federal and state laws, rules, and regulations and Canadian laws and regulations regarding the sale of goods to intended primarily for Children ("Children's Jewelry") including, but not limited to, the Consumer Product Safety Improvement Act of 2008 (CPSIA) and any applicable state laws governing the lead and cadmium content in Children's Jewelry.  The VBA and this Supplier Manual apply to all goods including Children's Jewelry. However, if conditions, covenants or agreements for goods described in this section are contrary to conditions, covenants or agreements contained in the VBA or Supplier Manual, the conditions, covenants or agreements contained in this section shall take precedence for such goods.

If the item is intended for children 12 years of age or younger (17 years or younger in Canada), Seller must identify the product as a "children's item" on the Product Linesheet or PIW and all related descriptive materials and correspondence.

The maximum allowable limit for lead in Children's Jewelry is 40 parts per million.  Seller is not permitted to sell Signet Children's Jewelry that contains any cadmium (for the avoidance of doubt, solder also must be cadmium free) unless a separate written cadmium agreement is signed in advance by an authorized Signet representative and all regulatory compliance, documentation and audit requirements, if any, of that separate agreement are maintained by Seller;

Seller must identify Children's Jewelry product(s) as a "children's item" on the Product Linesheet or PIW and all related descriptive materials and correspondence.

Pursuant to the CPSIA 2008, Signet must have a Children's Product Certificate (CPC) on file for each Children's Jewelry SKU stating that it meets CPSIA regulations for lead content.

To ensure compliance, it is mandatory that sellers of children's jewelry participate in Signet's Children's Jewelry Testing and CPC Verification program as detailed below. This program applies to all Children's Jewelry, including items composed entirely of karat gold, silver, platinum or stainless steel, or contains other components (e.g., rubber o-rings, leather, string, cord, paint, pigments, etc.).

**Children's Product Certificate (CPC) Verification**

If selling Signet Children's Jewelry, Seller must submit a CPC or a General Certificate of Conformity (GCC) from the original importer of record (or their own CPC/GCC if manufactured domestically) to the Signet Customs Compliance Department at zalecustoms@signetjewelers.com with a copy to Rene.Bautista@signetjewelers.com.  Please see an example of the CPC form at Appendix 20.

Once the Signet Customs Compliance Dept. receives the email with the valid CPC/GCC for the particular SKU(s), the PO for the SKU can be issued. NOTE: each CPC is only valid for a single SKU. There are no "blanket" CPCs.

NOTE: Failure to provide a valid CPC for SKUs will result in rejection/RTV of the Seller's shipment, a chargeback for freight costs, and a $2.00 per item  chargeback for non-compliance with Signet's requirements.

**Testing at UL Lab**

Signet has authorized UL-STR as its primary testing laboratory for Children's Jewelry. UL-STR is ISO 17025 certified and registered with the CPSC as an accredited laboratory for CPSIA third-party testing. UL STR's worldwide laboratories perform testing to international, national and regional standards.

The Signet Children's Jewelry Testing Program entails chemical testing for compliance of lead and cadmium and physical testing for hazardous sharp points and edges on a case-by-case basis. Please note standard turnaround time is 5-7 business days. In addition, it is important to note Signet will not accept any composite/component testing, each item must be sent complete to UL-STR for testing. Signet has requested that UL-STR hold the tested samples for a two year period at which time the samples will be made available to return to Seller.

All test samples must be accompanied by the approved Signet/ UL-STR testing application form. Prior to submittal, please note the sample quantity guideline below in accordance with CPSC/CCPSA testing:

| TEST PURPOSE | SAMPLE DESCRIPTION EXAMPLES | SUGGESTED SAMPLE QUANTITY (GRAMS) |
|---|---|---|
| Metals | Bracelets, Earrings, Necklaces, Rings* | Suggested quantity 1 Gram** |
| Surface Coatings | Enamel* | Suggested quantity 1 Gram** |
| Stones | Rhinestones, CZ , Glass* | Suggested quantity 1 Gram** |

   *These are examples; there may be other items that require testing not listed above.
   ** Quantity is suggested at 1 gram per component should secondary testing should be needed.

The product testing submittal should be filled in to show the final destination of product so that UL-STR will know to test in accordance with the United States CPSIA or Health Canada (CCPSA).

Upon receipt, UL-STR shall evaluate and test each sample as needed. Reports will be made to state "PASS" "FAIL" or "EXEMPT".  If declaration of materials falls within Class One (1) exemption and review confirms, report will be issued to Signet stating item/component as EXEMPT.

Seller may be contacted during the testing process to request further information confirming materials. Per the agreement with Signet, UL-STR *will only* forward reports to Seller in the event of a product testing failure.

Under the direction of UL-STR, vendors may be responsible to provide additional test samples. Seller must pay for failed tests or repeat tests even if they eventually pass. UL-STR shall invoice Seller directly on retests.  Please note that as part of Signet's worldwide testing agreement, UL-STR will extend the Signet discount to global vendors participating in this program.  Seller shall submit a credit application to UL-STR in advance of testing so there will be no delay in the processing or payment of a retest.

A UL-STR contact (listed below) can aide you in this process or with any questions you may have.

Seller should contact UL Lab for an application to submit samples for testing

▶   **UL Lab Contact Information**

Michele Rosicke
Michele.Rosicke@ul.com
Global Jewelry Manager, UL-STR

**USA**
Michele L. Rosicke
Michele.Rosicke@ul.com
T: 516.221.4135
M:860.830.4386
Denine Gale
Denine.Gale@ul.com
UL-STR (MA, USA)
85 John Road
Canton, MA 02021
T: (781) 821-2200 X577

**Hong Kong**
Roy Poon
Roy.Poon@ul.com
UL-STR (Asia Pacific Leader located in Hong Kong)
16/F - 17/F, Tower B, Regent Centre,
63 Wo Yi Hop Road,
Kwai Chung, N.T., H.K.
T: 852.2943.4663
M: 852.9820.0265
F: 852.2480.5700

**China**
Skally Zong
Skally.Zhong@ul.com
3-4/F Qingyi Supermask
Photoelectricity Building No.8 Langshan 2nd Road
North High-Tech Industrial Park, Nanshan District
Shenzhen 518057, P.R. China
T: +86 (755) 2601 8600 X000

**India**
Navneet Jindal
Navneet.jindal@ul.com
(Asst. Manager - Customer Service India)
UL Quality Assurance Pvt. Ltd.
Plot 108, Sector 6
IMT Manesar, Gurgaon, Haryana
122050, India
T: +91 (124) 469 8131
M: +91 991 090 1133
F: +91 (124) 469 8110

**Thailand**
Tailanga, Piyathorn; Customer Service

Piyathorn.Tailanga@ul.com
Underwriters Laboratories (Thailand) Limited
29th Floor; The Offices at Central World; No. 999/9 Rama Road;
Kwaeng Pathumwan; Khet Pathumwan; Bangkok; 10330 Thailand.
Attn Customer service
T: +6622074028
F: +6622072525

**Italy**
Francesca Angeloni
Francesca.Angeloni@ul.com
(Sales Manager - Italy)

# SECTION 5

## PURCHASE ORDERS

## PURCHASE ORDERS

Every purchase order ("Order") will contain (among other things) the following information:

- The Order number (which will normally contain 5-8 numbers and may contain letters (e.g. C10203040 or 65152 or SO98687)
- The Order Date (which is the date on which the order is issued)
- The Due Date (which is the date that the goods are required to be received at Signet or other address specified in the Purchase Order)
- Seller's reference number (e.g. style number) and Signet's reference number (i.e. SKU number) for each item included in the Order.  For items that do not have a reference number (e.g. loose diamonds), a description of the items will be provided.
- The quantity and unit cost of goods
- The metal lock price and metal lock date if the cost of the goods is dependent on the market price of precious metals.
  - For orders placed by a Product Linesheet: Metal lock prices are at the next day's 2nd London fix price.  Metal calculations are attached as Appendix 11(a).
  - For orders placed by PIW: Metal lock prices are per the terms of the PIW.  See Appendix 5(l) for metal calculations.
- The delivery address

An example Akron-based brand purchase order is attached as Appendix 12(a).  An example Dallas-based brand purchase order is attached as Appendix 12(b).  Purchase order coding references are attached as Appendix 12(c).

## ORDER SUBMISSION

Purchase Orders will be communicated via EDI, Vendor Portal, fax or mail.  If Seller is a complete or special order vendor and is not currently EDI compliant, Seller must become EDI compliant within 120 days of signing the VBA.

## EDI ORDER SPECIFICATIONS

Suppliers that are new to EDI with Signet or have questions about EDI capabilities, specifications or procedures should contact EDISupport@jewels.com for Akron-based brands and Cindy Cordell at 972 580-4546 or cindy.cordell@signetjewelers.com for Dallas-based brands.

The EDI Trading Partner Guidebook is attached as Appendix 13.

## PURCHASE ORDER ACCEPTANCE

Seller is required to check the following upon receipt of an Order:

- That the cost of the goods is correct
- That Seller is able to supply the quantities ordered
- That the Due Date(s) can be met
- That all other details on the Order are correct including address, reference numbers etc.

At Signet's sole option, Seller may be deemed to have accepted an Order if Seller:

- fails to notify Signet that the Order is not accepted within 7 days of the Order Date, or
- provides written acceptance of the Order, or
- commences any work on the Order, or
- delivers any goods contained in the Order, or
- otherwise acts in accordance with the Order.

An Order will form a binding contract between Signet and Seller as soon as it has been accepted (or deemed accepted) by Seller.  Each Order is subject to all the terms, conditions, covenants and agreements contained in the most recent VBA signed by Seller. The VBA incorporates by reference the most recent Supplier Manual as it may be amended from time to time along with any plans, forecasts, shelf stock requirements, licensing agreements, supply agreements, non-disclosure agreements, specifications, schedules, riders, exhibits, etc. that affect the Order and have been or may be reduced to writing by the parties from time to time.  If Seller's acceptance contains any terms or conditions additional to or different from those offered by or already agreed to by Signet, Seller hereby acknowledges notification of Signet's objection to all such terms and conditions.  Any additional or different terms or conditions are not binding upon Signet unless agreed in writing by an authorized Signet representative.  Only hard copies, faxed copies, or EDI or Vendor Portal transmitted Orders are considered binding.

## TERMINATION OF AN ORDER

Signet may for whatever reason, or for no reason, terminate any or all Orders at any time, with or without cause, by providing Seller written notice (including electronic notice).

If Signet, in its sole discretion, determines that Seller has breached or will breach any of the terms in the VBA or any of its incorporated writings including but not limited to this Supplier Manual or the terms and provisions of an Order, then Signet has cause and the right (but not the obligation) to cancel any and all Orders (or parts of Orders) at any time without incurring penalties or liability. Additionally, Signet has cause and the right (but not the obligation) to cancel any and all Orders (or parts of Orders) at any time without incurring penalties or liability if any of the following occur:
- Seller or one of its parent companies is declared insolvent
- Seller or one of its parent companies voluntarily or involuntarily files for bankruptcy
- Seller or one of its parent companies is appointed a receiver or trustee
- Seller or one of its parent companies executes an assignment for the benefit of its creditors

If Seller, at the time of termination without cause by Signet, has in stock or on firm order any raw, semi-processed, or completed goods for use in fulfilling Signet's Order, then (i) in the case of completed goods, Signet may, at its option, either require delivery of all or part of the completed goods and make payment at the per unit price of the Order or (without taking delivery thereof) pay Seller the excess, if any, of the contract price over the market price at the time of termination, (ii) in the case of raw or semi-processed goods, Signet may, at its option, either require Seller to complete and deliver all or part of such goods at the per unit price of the Order or (without taking delivery thereof) pay Seller for such raw or semi-processed goods that are properly allocable to the Order a proportion of the per unit price of the Order based on the stage of completion of such goods and reduced by the value of such goods at such stage of completion, (iii) in the case of goods which Seller has on firm order, Signet may at its option, either take an assignment of Seller's rights under such order or pay the costs, if any, of settling or discharging Seller's obligations under such order.

Signet will have no liability to Seller (including liability for any direct or indirect loss of profits, revenue, anticipated profit, business or contracts) in respect of any cancellations of Orders where the cancellation is made under this section.

# SECTION 6

## DELIVERY & PRESENTATION OBLIGATIONS

## DELIVERY

Time is of the essence as to Seller's performance.  At Signet's sole discretion, any Akron-based brand Order*, excluding special orders, that is delivered three (3) days or more before or after the due date of the Order and any Dallas-based brand Order**, excluding special orders, that is delivered outside the timeframe established on the PO constitutes a material breach of the Order and will result in either a liquidated damages chargeback to Seller of 10% of gross receipt (with a minimum chargeback of $500) or cancellation of the entire Order and the return of the delivered goods at Seller's expense.  Seller must not deliver an Order prior to the due date, except special orders which Seller should deliver as quickly as possible regardless of due date, without the permission of Signet's respective inventory analyst.  Additionally, at Signet's option, Orders delivered before the due date without permission will result in either the Order being paid referencing the due date or the return of the Order at Seller's expense.  All freight charges for goods returned to Seller and subsequently shipped back to Signet will be the sole cost of Seller.  Seller must comply with the Signet North America Vendor Routing Guide for all domestic U.S. shipments and Canada.  Imported goods must comply with the country of origin requirements in this Supplier Manual.  The policy for late special orders is available in the Special Orders Section below.

*For Akron-based brand Orders: the product must be delivered in the timeframe of 2 days prior to or 2 days after the due date on the purchase order.

**For Dallas-based brand Orders: the product must be delivered in the timeframe established on the purchase order (i.e. not before / not after the purchase order dates).

## CUSTOMS AND IMPORTS

The United States Customs and Border Patrol and the Canadian Border Service Agency randomly inspect import shipments.  There is no method for pre-determining if Customs will inspect a Seller's shipment. Although shipments may be expedited through air transportation, the examination of documents and inspection of freight is not an expedited process.

### NORTH AMERICAN FREE TRADE AGREEMENT (NAFTA) and U.S.-Mexico-Canada Agreement (USMCA)

On July 1, 2020, USMCA replaced NAFTA, which provides preferential trade treatment for goods and services between the United States, Canada, and Mexico.  To receive benefits, goods must be deemed "originating" from a USMCA territory.  If you are not sure if your merchandise qualifies for a USMCA exemption, please contact a Customs broker, the U.S., Canadian, or Mexican Customs Service, or an attorney to help you make that determination.

- If your product was set up in Signet's Product Information Worksheet (PIW) as being USMCA eligible, then you must provide the Signet Customs group with a valid certificate before the first import.
- Put the following statement on the commercial invoice provided to the Customs Broker:
  - "I certify that the goods referenced in this invoice comply with the origin requirements specified for these goods in the U.S.-Mexico-Canada Agreement (USMCA), and that further processing or assembly outside the territories of the parties has not occurred subsequent to processing or assembly in the USMCA region."

38

- If the certificate is for one shipment, a copy of the certificate is to accompany the shipment.
- If you are providing a blanket certificate for a designated time period, be sure that the import is occurring within the approved time period.  Blanket time periods should only be for 1 year.
- If the blanket certificate has expired, and Signet does not receive a valid certificate before the product is imported, the additional duty on the Customs entry will be charged back to the Seller.
- When completing a USMCA Cert., please note the following:

    o Provide a complete description of the product, with your part number and, if possible, include Signets part number on the Certificate.  We must be able to cross reference your part number to the Signet SKU.
    o If you are the producer of the goods, Col. 8 should say YES.   If you are not the producer, say NO, and indicate the number (1), (2) or (3), which corresponds to a statement on the back of the certificate.
    o The signature on the USMCA Cert must be by someone who has knowledge of the rules and manufacturing process.  The person signing should be an officer of the company, a production manager, a legal representative or anyone who has the knowledge and can produce the records.
    o Make sure the signature is legible.  Print the name & title of the person signing the certificate.
    o Do not leave any columns blank on the form.
    o Review the preference criteria.  If showing an "A", that mean the product is WHOLLY originating in the USMCA territory.

## UNITED STATES FREE TRADE AGREEMENTS

The United States has established free trade agreements with many countries around the world. Goods produced or manufactured in these countries receive duty free entry into the United States.

Established Free Trade Countries:
For a list of countries with free trade agreements, visit: https://ustr.gov/trade-agreements/free-trade-agreements

## GENERAL PREFERENTIAL TREATMENT

The General Preferential Treatment (GPT) program allows participating countries reduced duty rates into Canada.

The General Preferential Treatment (GPT) program
- Applies to many emerging countries around the world
- Requires 60% of the value of goods to originate in the GPT country, and
- Requires merchandise to ship directly from the qualifying country into Canada.

If a Seller's goods qualify for the GPT program, the Seller must include a statement on the invoice indicating participation in the program.  A properly completed GPT Form A must accompany the shipment.    If the form is not provided, the goods will be assessed full duty taxes.   **If the form is not on file, the broker will not be able to claim the duty reduction, and the goods will be assessed duty taxes.**

Commercial Invoice Statement:

> "The goods described in this invoice or in the attached invoice No._____ were
> produced in the beneficiary country of _____ and at least _____% of the
> ex-factory price of the goods originates in the beneficiary country/countries
> of _____."

Countries qualifying for GPT status:

For a list of countries and applicable tariff treatments, visit: http://www.cbsa-asfc.gc.ca/trade-commerce/tariff-tarif/2018/html/countries-pays-eng.html

## SELLERS SHIPPING FROM CHINA

When appropriate, merchandise Sellers shipping from China must include a statement regarding "no solid wood packing material." Without the statement, the goods cannot enter the United States.

## GOVERNMENT PARTNERSHIPS

1. Partners in Protection  -  PIP (Canada)

Signet and the Canada Border Services Agency are partnered together through PIP, Partners in Protection, to enhance border security, combat organized crime and terrorism, increase awareness of customs compliance issues and help detect and prevent contraband smuggling.

2. Customs Trade Partnership Against Terrorism C-TPAT (U.S.A)

Signet and U.S. Customs and Border Patrol are partnered together through C-TPAT, (Customs -Trade Partnership Against Terrorism), to secure the international supply chain and protect the country's security.  Signet has been certified by C-TPAT at Tier Level 3.   This certification requires that our Sellers complete and return the C-TPAT Business Partner Questionnaire.

## CUSTOMS – TRADE PARTNERSHIP AGAINST TERRORISM (C-TPAT)

SIGNET NOTICE TO SELLERS

This is to serve as notice that Zale Delaware, Inc., Zale Canada Co. and its subsidiaries and affiliates (for purposes of this subsection, collectively "Zale") are participants in the Bureau of Customs and Borders Protection's Customs – Trade Partnership Agreement Against Terrorism, commonly referred to as "C-TPAT."   The C-TPAT program is a joint effort between U.S. Customs and the trade community to reduce the threat of terrorism by means of protecting the integrity of cargo imported into, further processed or warehoused in, and/or exported from the United States.  This necessarily requires the securitization of the entire supply chain beginning with the offshore production of materials, goods and component goods and continuing on to the warehousing and transport of such goods and materials until their entry into the United States and distribution into U.S. commerce or abroad. Shipments of importers participating in C-TPAT will receive expedited entry into the United States and fewer examinations. Alternatively, where an importer cannot demonstrate the security of its supply chain, delays and increased inspections of incoming cargo will result at the U.S. borders.

As a strong advocate of C-TPAT, Zale's goals are to enhance and maintain effective security processes throughout the global supply chain, and to ensure the timely delivery of all incoming cargo. As a valued business partners to Zale, your support of C-TPAT is critical to the

realization of its objective and to the cooperative endeavour between U.S. importers and U.S. Customs. At Zale's request, all of its cargo service providers including, but not limited to, freight carriers, freight forwarders and customhouse brokers, have joined or are in the process of applying for C-TPAT membership.  Zale strongly recommends that all of its domestic merchandise business partners participate in the C-TPAT program as well. In addition, U.S. Customs expects foreign Sellers of imported goods to scrutinize or, where necessary, develop sufficient security measures within their own supply chain. Accordingly, Zale requires each of its Sellers to notify their plants, offices, and subsidiaries about the C-TPAT program and of Zale's participation in it.

In securing its supply chains, Zale requires all domestic, foreign Sellers, and all business partners to apply the C-TPAT Security Criteria Elements found in Appendix 21 C-TPAT Business Partner Questionnaire attached hereto.

## FREIGHT POLICY

Signet reserves the right to audit and verify all freight charges billed to Signet.  Seller must bill freight at actual cost.  Upon request, Seller must supply original freight invoices to Signet. Signet reserves the right to pay and remit only reasonable and customary freight charges that are charged in accordance with this Supplier Manual.  Signet is not responsible for and will not pay freight charges associated with the return of defective merchandise to Seller or the subsequent reshipment to Signet, if any.

The Signet North America Vendor Routing Guide is attached as Appendix 14.  By signing Signet's VBA, Seller agrees to comply with all aspects of the Signet North America Vendor Routing Guide for all domestic U.S. shipments and Canada.

## PRESENTATION

Seller must comply with bagging guidelines.  If Seller is required to ticket merchandise, Seller must comply with ticketing guidelines.  Seller must order and pay for their bags, pads, clamshells, inserts, twisties, and tickets and shall pre-ticket merchandise prior to delivery. Ticketing and bagging guidelines are attached at Appendix 15(a) or, if your good(s) are for Dallas-based brand Pagoda as indicated in an applicable PIW, the Pagoda Product Tagging Guide is attached at Appendix 15(b).  If Seller is required to ticket merchandise, at Signet's sole discretion, a failure to properly ticket merchandise with the correct tickets will result a liquidated damages chargeback to Seller according to the following schedule:

- Failure to properly ticket 100 units or less in an Order . . . . . . . . . . $100 Chargeback
- Failure to properly ticket 101-500 units in an Order. . . . . . . . . . . . $500 Chargeback
- Failure to properly ticket 501-1000 units in an Order. . . . . . . . . . . .$1000 Chargeback
- Failure to properly ticket more than 1000 units in an Order will result in a chargeback of no less than $1000 and will be handled on a case by case basis.

# SECTION 7

## SPECIAL ORDERS

This section applies to Special Order goods ("SO" goods) only.  The VBA and this Supplier Manual apply to all goods including SO goods. However, if conditions, covenants or agreements for SO goods described in this section are contrary to conditions, covenants or agreements contained in the VBA or Supplier Manual, the conditions, covenants or agreements contained in this section shall take precedence for SO goods. Seller supplying SO goods for Zales Product must comply with the bagging guidelines as attached at Appendix 15(c).

Signet gives its retail customers the ability to place single item special orders.  The proper coordination, communication, quality control and adherence to receipt dates of these orders are a requirement of doing business with Signet.

Charges will be levied against Seller for violations of the VBA or the Supplier Manual relating to SO goods.

## SURCHARGES AND GOLD POLICIES

Signet will not accept surcharges for SO goods including additional labor charges or restocking fees.

Signet does not charge its customers for merchandise requested in different color gold, and will not accept additional charges from Seller for SO goods ordered in different color gold.

## SIZING POLICY

If an Order for SO goods contains specific size rings, Signet will not pay additional charges for decreasing or increasing a ring size within two sizes over or under the stock size.  Any additional charges for increasing or decreasing a ring by more than two sizes must be within reasonable and customary costs unless approved in advance by Signet's Special Orders department.

## LATE ORDER POLICY

Time is of the essence as to Seller's performance.  Seller should ship SO goods as quickly as possible, but SO goods must be shipped on or before the ship date as notated on the weekly Open Order Report.  If customer service issues result from Seller shipping SO goods after the ship date, Seller may be charged for customer service amends or lost sales that Signet incurs.

## SUPPLIER PERFORMANCE

Suppliers of SO goods to Signet are required to complete and return the Open Order Confirmation Report to Signet's Special Orders department within the specified time.  Price changes, adjustments or discontinued products are to be communicated to Signet in the Open Order Confirmation Report.

Suppliers of SO goods to Signet will be evaluated quarterly based on delivery timing, quality of goods, repairs and overall customer service.  If Seller is a supplier of SO goods and Seller's performance is below the minimum standards set by Signet's Special Order department, Signet's Special Order department at its sole discretion, has the right to terminate any and all SO goods orders and business with Seller without penalty or liability.

## CATALOGS

If Seller prints catalogs or other promotional materials for use by Signet in its retail locations, those materials must present diamond carat weights and gemstone treatment disclosures in accordance with FTC guidelines and other applicable state and federal laws and Canadian laws or treaties.  Diamond carat weights must be stated in fractions instead of decimals, and actual diamond carat weights for goods promoted in those materials must fall into the ranges specified in the diamond weight disclosure.

# SECTION 8

## LOOSE MEMO GOODS AND CONSIGNED MERCHANDISE

## LOOSE MEMO GOODS REQUIREMENTS

This section applies to loose diamond and loose gemstone goods purchased on consignment ("Loose Memo Goods") only.  The VBA and Supplier Manual apply to all goods including Loose Memo Goods. However, if conditions, covenants or agreements for Loose Memo Goods described in this section are contrary to conditions, covenants or agreements contained in the VBA or Supplier Manual, the conditions, covenants or agreements contained in this section, Loose Memo Goods, shall take precedence over Consigned Merchandise, which shall both take precedence over the VBA and Supplier Manual.  By signing the VBA, Seller acknowledges and agrees that any consignment agreement(s) between Signet and Seller with an effective date prior to January 1, 2015 is hereby cancelled, null and void, and of no further force and effect.

1.  Stones are to be shipped on a consignment basis.

    A.  Signet will supply requests to Seller.
    B.  All requests submitted by 4:00 PM EST must be answered by 8:00 AM EST the following business day with availability of requested stones.
    C.  Seller must hold offered goods through the following business day, unless they call to notify Signet otherwise.

2.  All consignments must be shipped to stores with item description, total cost, MPO and SKU listed.

3.  Once Seller quotes a price for goods, that price is "locked in."

4.  When stones are sold, Signet will issue a purchase order within **20** days.

    A.  Seller must invoice Signet with **purchase order number listed on invoice**.

5.  Seller must respond to an open order report within 1 business day.  If Seller does not correct errors or omissions on the report within 60 days, Signet is not responsible for payment.

6.  Seller must supply Signet with tracking information once the order ships, which must be within 24 hours of the Memo Order.

7.  Signet may return goods to Seller for full credit within **100** days of the date or purchase.

8.  All certified stones being sent on consignment will include a copy of their certified documents.  Once the stone has been sold, the original certification paperwork will be sent to the store.

9.  If for some reason ordered goods cannot be delivered on time, Seller must notify Signet immediately.

10. Stores cannot order goods from Seller directly.  If Seller sends goods to a store without Signet's home office approval, Signet will not take financial responsibility for those goods.

11. Seller cannot hand deliver goods to stores without Signet's approval.

12. If Seller receives incorrect goods back from a store, Seller will immediately notify the Memo Special Order Team.

13. All stones are to be shipped according to Signet's North America Vendor Routing Guide, which is attached at Appendix 14.

14. Stones that are supplied to our stores that do not meet Signet's quality standards and guidelines may be returned to Seller for credit at any time after purchase.  There is no time limit.

15. Signet does not accept EGL certified diamonds unless requested by Signet.

16. If Seller supplies a stone to Signet that does not meet the quality grading quoted to Signet, Seller at its sole cost and expense will be responsible for supplying to Signet within 48 hours a stone of the same or larger size that does meet the quality grading quoted.  If Seller is unable to replace the stone to Signet's reasonable satisfaction, Signet at its sole discretion may replace the stone and charge Seller for any and all costs or expenses incurred including but not limited to the difference between the cost of the replacement stone and the original stone.

## CONSIGNED MERCHANDISE REQUIREMENTS

This section applies to all merchandise purchased on consignment ("Consigned Merchandise"). The VBA and Supplier Manual apply to all merchandise including Consigned Merchandise. However, if conditions, covenants or agreements for Consigned Merchandise described in this section are contrary to conditions, covenants or agreements contained in the VBA or Supplier Manual, the conditions, covenants or agreements contained in the Loose Memo Goods section shall take precedence, then this Consigned Merchandise section followed by the VBA and Supplier Manual. By signing the VBA, Seller acknowledges and agrees that any consignment agreement(s) between Signet and Seller with an effective date prior to January 1, 2015 is hereby cancelled, null and void, and of no further force and effect.

1. Signet will from time to time issue purchase orders to Seller for Consigned Merchandise stating the expected delivery date, shipping terms, and shipping location.  Signet shall ship Consigned Merchandise to the store(s) of its choice for sale to Signet's customers.  Signet may transfer Consigned Merchandise across stores. Instore Consigned Merchandise placement, promotions, and advertising shall be at the discretion of Signet.

2. Signet shall inspect the Consigned Merchandise and shall notify Seller of any items that are damaged, non-conforming or missing or that were not requested to be delivered, and shall return any such Consigned Merchandise promptly at Seller's cost. Consignor agrees to accept and to promptly replace all defective Consigned Merchandise, subject to availability.

3. At the request of Signet, Seller shall provide all information and documentation that may be required by Signet for purposes of importing the Consigned Merchandise into a particular country, including information relating to the tariff classification, origin, duties and customs valuation of the Consigned Merchandise.  This also includes, but is not limited to, NAFTA and other Certificates of Origin or similar statements or documentation as applicable for purposes of preferential duty treatment.

4. Seller shall set Signet's purchase price for Consigned Merchandise without regard to Signet's retail sale price, which shall be determined in Signet's sole discretion.  For Akron-based brands, Seller shall invoice Consigned Merchandise to Signet at the time of conversion.  For Dallas-based brands, invoice access is available via Vendor Portal.

5.      Signet may convert Consigned Merchandise at any time. When Signet sells Consigned Merchandise to a customer, title to the Consigned Merchandise shall pass from Seller to Signet and immediately thereafter from Signet to its customer.  Signet may sell or return Consigned Merchandise in the ordinary course of its business. Customer returned Consigned Merchandise shall be reversed off Seller's invoice and returned to Consigned Merchandise.  Conversion may not occur during transit.

6.      Signet shall have control of and accepts all risks of loss for Consigned Merchandise from the time of acceptance by Signet until title transfer to its customer or delivery to the carrier for return to Seller.  Further, Signet shall assume all credit risks associated with retail sales of the Consigned Merchandise to its customer.

7.      If Signet shall incur and directly pay for any Losses, Seller agrees to reimburse Signet for such Losses within fifteen (15) days after receipt of written notice and reasonable proof from Consignee of the incurring of such Losses.

8.      Upon ninety (90) days' notice, Seller may request Signet return Consigned Merchandise.  Upon expiration of the ninety (90) day notice period, Signet shall have the right to purchase such items of the Consigned Merchandise as it may desire by sending Seller a statement of its intent to do so along with a list of those pieces of Consigned Merchandise that Signet shall purchase and which shall be accompanied by payment thereafter.  At Seller's request, Signet shall return Consigned Merchandise for quality related issues or Seller's bankruptcy or receivership.

9.      If Seller is based in the US, Zale Canada invoices will be valued at the exchange rate for the selling month and invoiced in USD as such.

## UCC FINANCING STATEMENTS

Seller must not file any uniform commercial code (UCC) financing statements covering consigned goods without executing Signet's standard consignment agreement in a form acceptable to Signet and obtaining prior written approval by Signet's legal department of the form and content of such UCC financing statement.  In the event Seller files a UCC financing statement without obtaining prior written approval, Signet may, in its sole discretion, terminate such filing or file an appropriate amendment.  In no event shall any financing statement reference any claim to any assets of Signet or any claim to proceeds of the consigned goods, and Seller shall have no interest whatsoever in any such proceeds.

## SUPPLIER REQUESTED RETURNS

If Seller or any third party, including but not limited to a trustee in bankruptcy, liquidation agent, conservator, a successor-in-interest or other authorized agent, requests that goods supplied on consignment or as samples to Signet are returned, Signet will use commercially reasonable efforts to comply with said request subject to Signet's rights a) at law; b) under other applicable written agreements or policies and c) under this Supplier Manual, including but not limited to the following provisions:

1.      Upon receipt of any request for return of goods, Signet will determine whether the request conforms to the applicable terms of the Consignment Agreement (e.g. accompanied by copy of judicial order, purchase and sale agreement or other evidence of a third party's authority to request such return).

2.  If the request conforms to the applicable terms of the Consignment Agreement, Signet will have a reasonable amount of time, but no less than 90 days, to aggregate and return the requested goods.

3.  Seller or its authorized agent must pay Signet all costs, fees and expenses incurred in connection with Signet's return of goods, which include but are not limited to packaging, shipping and any other related expenses. Signet has the right to chargeback the amount of these costs, fees and expenses against Seller's account at any time.

4.  Unless Signet has received timely notice (that is, within 30 days of its issuance) that any report regarding memo inventory and sales issued to Seller ("Memo Report") is incorrect, the Memo Report will be deemed conclusive and binding on Seller and any agent described above. Signet's obligation to return goods shall be limited to the extent indicated on such Memo Report, plus any additional receipt of goods and minus any sales of goods made since the date of the Memo Report.

5.  Signet is not obligated to return goods to a party other than Seller itself unless and until Seller and such third party have signed a letter or agreement, acceptable in form and substance to Signet, indemnifying and holding Signet harmless from and against any losses, costs or damages that Signet or its affiliates might incur in returning the goods to the third party.

# SECTION 9

## PRICES AND INVOICES

## PRICE

The price of goods in a purchase order ("Order"):

- is the price agreed between Signet and Seller as indicated in the approved Product Linesheet or PIW.

- may be contingent upon the metal lock date of the Order.  If agreed by Signet and Seller in the Order, Product Linesheet, PIW or other writing, the price of silver, gold and platinum, if any, in an Order will be fixed at the next day's 2nd London fix price for Product Linesheets or per the terms of the PIW, subject to any percent over metal percentages that Signet and Seller have agreed to in the VBA.  No surcharges will be applied and all gold must be plumb gold.

- can only be varied with the written consent of an authorized Signet representative.

## PAYMENT

Seller shall be paid, except as otherwise stated in an Order, upon submission of proper invoices, at the agreed prices, provided that Signet has Seller's current tax identification number and W-9 (or W-8) on file (including the proper tax identification number).  Seller must submit a W-9 (or W-8) upon request and whenever a change to Seller's information becomes effective.  A blank W-9 form is attached as Appendix 16.  All invoices must be submitted electronically at the time of shipment with a hardcopy included as a packing slip.   Failure to present invoices for payment in a timely manner or to present invoices in a manner consistent with the requirements set out in the section will lead to delays in payment and/or deductions for handling charges.

For Akron-based brands, all invoice payments are subject to the terms and discounts provided on the summary page of the VBA (T&D), and are due and payable from the latter of the receipt of invoice or receipt of goods at Signet, not the date of the invoice.  For Dallas-based brands, all invoice payments are subject to the terms and discounts provided on the summary page of the VBA (T&D), and are due and payable from the latter of date of the invoice or receipt of goods at Signet.  The T&D must not be less favorable to Signet than the terms the Seller has given to any other person or entity.  If Seller gives another person or entity terms more favorable than the T&D (Superior Terms), those Superior Terms will automatically become the T&D for Signet without any action by either party.

Seller agrees that (i) amounts owed to Seller will be subject to all claims and defenses of Signet, whether at law or at equity, whether arising from the transaction giving rise to the particular obligation or any other transaction or occurrence, (ii) Signet and any affiliate of Signet (an "Signet Entity") shall have the right to set off all or any part of the amount of any indebtedness or other obligation (e.g. a chargeback, return for credit, etc.) owed by Seller or any of its affiliates (a "Seller Entity") to any Signet Entity against any indebtedness or other obligations owed by the same or any other Signet Entity to the same or any other Seller Entity, and (iii) each Signet Entity shall have the right to sell or assign any indebtedness or obligation, either owed to or by any Signet Entity with respect to any Seller Entity, to effect any setoff provided for herein or for any other purpose.

If Seller has a United States or Canada address for payment and supplies an Akron-based brand, Seller must submit the Vendor ACH Deposit Authorization form via fax to (330) 670-6708.  A blank Vendor ACH Deposit Authorization form is attached as Appendix 17(a).  If Seller has a United States or Canada address for payment and supplies a Dallas-based brand, Seller must

submit the Electronic Payment Program Enrollment form via email to vendorrelations@signetjewelers.com. A blank Electronic Payment Program Enrollment form is attached as Appendix 17(b). It is Seller's responsibility to submit a new Vendor ACH Deposit Authorization or Electronic Payment Program Enrollment form when a change occurs.

If Seller does not have a United States or Canada address for payment, Seller must submit detailed wire payment instructions via fax to (330) 665-7919 for payment of Akron-based brand Orders. A blank wire payment instructions form is attached as Appendix 18. For payment of Dallas-based brand Orders, Seller must complete the Electronic Payment Program Enrollment form via email to vendorrelations@signetjewelers.com. A blank Electronic Payment Program Enrollment form is attached as Appendix 17(b). It is Seller's responsibility to submit new instructions when a bank change occurs.

Sellers located within the United States and outside of Canada are paid in US dollars (USD). Sellers located in Canada are paid in Canadian Dollars (CAD).

## INVOICE SUBMISSION

All invoices, including shipments of memo product, must be sent via EDI at the time of shipment. A hardcopy invoice must be included with each shipment as a packing slip. If Seller is a complete or special order vendor and is not currently EDI compliant, Seller must become EDI compliant within 120 days of signing the VBA. Failure to become EDI compliant within the 120 days will result in a $150 charge per invoice for all invoices received non-EDI or transmitted with errors.

Quantities invoiced must agree with those on the packing slip, and in the case of gold products being sold by the gram, quantities and weights invoiced must agree with those on the packing slip.

## INVOICE MATCHING

Each Purchase Order must be invoiced separately irrespective of whether goods from multiple Purchase Orders are delivered at the same time.

## STATEMENT OF ACCOUNT

Seller must provide Signet with a Statement of Account listing outstanding invoices and full details of any items in dispute on a monthly basis. A Statement of Account for the previous month is due no later than the 7th calendar day of the next calendar month. This will ensure that any amounts in dispute can be investigated promptly and copy invoices requested if required.

## PAYMENT DEDUCTIONS

The Accounts Payable department will send a remittance advice at the time of payment, listing invoices being paid less any deductions for debit notes and discounts.

Full details of any debit notes in dispute must be submitted in writing to the Accounts Payable department within 3 months of deduction from the payment.  Any claims or disputes after this time lapse will be deemed to be waived and will not be valid.

The address and contact details for remittance statements and debit note copies are:

> Signet
> Accounts Payable Department
> 375 Ghent Rd.
> Akron, Ohio 44333
> Fax number: 330 668-5192
> 330 668-5000 x5348

> Or

> Zale Delaware and Zale Canada
> P.O. Box 152777
> Irving, TX 75015-2777
> vendorrelations@signetjewelers.com

## CHARGEBACKS

| DESCRIPTION OF CHARGEBACK | LIQUIDATED DAMAGE/CHARGEBACK |
|---|---|
| **Quality obligation rejection of goods:** | $2.00 chargeback per item rejected, shipping and handling at Seller's expense, and potential 10% late order fee. |
| **Defective merchandise after initial quality assurance:** | Item returned for credit, repair, or replacement at no charge. |
| **Freight on defectives:** | Seller will be responsible for all inbound and outbound freight charges on defective product. |
| **Items found with non-compliant product specifications (e.g. Assay Failure):** | $5,000 chargeback per item failed and the return of all of the same style # or SKU that were part of that Order for credit plus shipping and handling at Seller's expense |
| **Testing for non-compliant product specifications:** | $27.50 testing fee for each item tested (regardless of if a failure occurs) plus the item's cost.  The tested item may be returned to Seller at Seller sole cost and expense. |
| **Failure to provide a valid Children's Product Certificate:** | $2.00 chargeback per item rejected, shipping and handling at Seller's expense, and potential 10% late order fee. |
| **Delivery outside of acceptable time frame:** | 10% of gross receipt with a minimum chargeback of $500 or cancellation of entire order plus the return of the delivered goods at Seller's expense. |

| | |
|---|---|
| **Failure to ticket properly:** | *Failure to properly ticket 100 units or less in an Order . . . . . . . . . .$100 chargeback |
| | *Failure to properly ticket 101-500 units in an Order . . . . . . . . . . $500 chargeback |
| | *Failure to properly ticket 501-1000 units in an Order. . . . . . . . $1000 chargeback *Failure to properly ticket more than 1000 units in an Order will result in a chargeback of no less than $1000 and will be handled on a case-by-case basis |
| **Non-compliance with our routing guide and shipping charges:** | Chargebacks will be issued to the vendors for the cost of the shipment, plus associated administrative fees |
| **Failure to become EDI compliant:** | $150 chargeback per invoice for all invoices received non-EDI or transmitted with errors. |
| **Failure to provide a weekly Repair Report, incomplete repair report, or failure to utilize the Signet Vendor Repair Portal:** | $50 chargeback per missed or incomplete Repair Report or per each week the Signet Vendor Repair Portal is not utilized. |

## EDI INVOICE SPECIFICATIONS

Suppliers that are new to EDI with Signet or have questions about EDI capabilities, specifications or procedures should contact Marcia Keene in Signet's IT department at 330 668-5000 x5479 for Akron-based brands and Cindy Cordell at 972 580-4546 or cindy.cordell@signetjewelers.com for Dallas-based brands.

The EDI Trading Partner Guidebook is attached as Appendix 13.

# SECTION 10

## DEFECTIVE AND RETURNED GOODS

Seller agrees to provide Signet with an address for returns that is in the United States of America ("USA").  If an affiliate of Seller has shipped or sold goods to Signet (or one of its affiliates) that Signet desires to return to such Seller affiliate for repair or otherwise under this Supplier Manual, then Seller agrees that Signet may return such goods to Seller's USA address for returns provided that such affiliate of Seller does not have a USA address for returns.

## WARRANTY

Seller warrants that goods shall be free from liens and defects in design, material, workmanship, and title, and shall conform in all respects to the terms of the respective Order and to the applicable drawings Product Linesheets and PIWs issued for manufacture.  If no quality is specified, the quality of the goods must be new and of the best quality.  Seller warrants that the goods are fit for the particular purpose for which Signet has purchased them.

## NEW GOODS DEEMED DEFECTIVE

New goods that do not meet Signet's quality control or assay processes will be deemed defective and returned to Seller at Seller's sole expense.  If goods deemed defective are returned for replacement or repair, all other provisions of the VBA and the Order remain unaffected including the original due date and the liquidated damages provision for late delivery.  All freight charges for goods returned to Seller and subsequently shipped back to Signet will be the sole cost of Seller.

If Seller is unable to deliver repaired or replacement goods within an acceptable time, in Signet's sole discretion, which shall not be less than twenty-one (21) days of the date returned to Seller, Signet may, at its option, cancel the Order or any part thereof at Seller's sole expense and issue a chargeback for the full amount of the Order or any part thereof including the cost of components supplied by Signet (diamonds, color gemstones, etc.).

If new complete goods are returned to Seller for replacement or repair, Signet, in its sole discretion, may immediately chargeback these goods to Seller at the accepted cost and automatically issue a new repair purchase order at the original price and metal lock date of the original Order to be sent via normal channels.  Please note that the preceding sentence applies only to new complete goods that are deemed defective and does not apply to assembly, special orders, etc.

## GOODS THAT PASS INITIAL QUALITY CONTROL BUT ARE LATER DEEMED DEFECTIVE

Goods that pass Signet's initial quality control and assay processes, but are later determined by Signet in its sole discretion to be defective will be returned to Seller for credit, repair or replacement at Signet's sole choice and at Seller's sole expense.  If such defective goods are not replaced or repaired and returned to Signet within an acceptable time, in Signet's sole discretion, which shall not be less than thirty (30) days, the cost of the goods will be charged back to Seller.  All freight charges for goods returned to Seller and subsequently shipped back to Signet will be the sole cost of Seller.

## CUSTOMER RETURN POLICY

Signet provides its retail customers with a return/exchange guarantee.  Consequently, Signet reserves the right in its sole discretion to subsequently return said customer returns to Seller for credit, repair, replacement, or partial chargeback at Signet's sole choice and at Seller's sole expense unless otherwise agreed to by the parties.  If Signet elects to return goods to supplier for repair, Seller must repair and return said merchandise to Signet within an acceptable time, in Signet's sole discretion, which shall not be less than thirty (30) days.  Gold or platinum items with excessive wear, damage or alterations (e.g. engraved, shortened, etc.) that render the item unrepairable will not be returned.  If you receive gold or platinum items in this condition please contact Signet at 1-800-877-8175 Ext. 5035.  At its sole discretion, Signet reserves the right to exercise a return for full credit items that are primarily composed of contemporary metals such as titanium, tungsten, stainless steel, cobalt and sterling silver regardless of the condition of the items. Items that are engraved by Seller before delivery to Signet (or a third party) shall not be considered "altered" or "damaged" under this provision solely because they were engraved by Seller.

## CUSTOMER OWNED REPAIRS POLICY

If Signet elects to return customer owned product to supplier for repair, Seller must repair and return said merchandise to Signet within thirty (30) calendar days for domestic repairs, sixty (60) calendar days for overseas repairs and fourteen (14) calendar days if replacement stones are supplied by Signet. Stones replaced by the seller must meet or exceed the current stones attributes. Customer merchandise that is replaced with a new piece must be returned in the ring size sent to the Seller. If the repaired merchandise does not meet Signet's quality control it will be deemed unacceptable and returned to Seller to be repaired to original standard.  If goods deemed defective are returned for replacement or repair, the original due date still stands.

Repair costs for repair only vendors will be set based upon the previously agreed upon labor and materials price list. If Seller is unable to deliver repaired or replacement goods by the original due date, the Seller will be charged 10% of the insurance value of the piece.

If requested by Signet, Seller is required to provide Signet weekly reporting regarding the repair status of customer merchandise, even if there are no outstanding repairs ("Repair Report"). The Repair Report shall be provided to Signet in a form supplied by Signet that may include, but is not limited to, the following: (i) Seller's name; (ii) Seller's vendor number (iii) repair number; (iv) Signet store number; (v) date the repair was received: (vi) the status of the repair (i.e. shipped to store, waiting on parts, estimate provided to store, etc.); (vii) the promised return date; (viii) the date shipped back to Signet; (ix) and tracking number for such shipment.  Seller's Repair Report shall include any repair merchandise received from Signet through the time such merchandise is shipped back to Signet with a tracking number provided to Signet.  A Repair Report is considered missed if not received by 5:00 PM EST each Wednesday or the next Business Day if such Wednesday is a Federal Holiday.  For Repair Report submissions, please send to repairvendorstatus@signetjewelers.com. If requested by Signet, Seller shall upload the Repair Report through Signet's online Vendor Repair Portal on a daily or weekly basis.  Sellers uploading complete Repair Reports through Signet's online Vendor Repair Portal may not be required to submit reports via email.   Direction will be provided by Signet on accessing and utilizing the Signet Vendor Repair Portal through manual updates and/ or file upload processes. Failure to provide a weekly/ daily report, providing an incomplete Repair Report, or failure to utilize the Signet Vendor Repair Portal will result in a chargeback of $50.00 per missed or incomplete report or per each week the Signet Vendor Repair Portal was not utilized as liquidated damages for non-compliance with Signet's requirements.

# SECTION 11

## MISCELLANEOUS

## COMPLIANCE WITH LAWS & INFRINGEMENT

Seller's performance and all goods delivered under this Supplier Manual must be in accordance with any and all applicable Executive Orders, Federal, State, Municipal, and Local Laws and Ordinances as well as any treaties, rules, orders, requirements, and regulations.

Seller is responsible for obtaining necessary permission and releases from any third parties that have intellectual property rights including without limitation, trademark, patent, or copyright rights ("IP Rights") arising under common law or otherwise and relating to goods Seller supplies to Signet. Infringement or dilution of any third party IP Rights is the sole responsibility of Seller, and as such Seller agrees to indemnify Signet according to the indemnification and insurance provisions contained in this Supplier Manual.

## INDEMNIFICATION & INSURANCE

Seller agrees to jointly and severally indemnify, defend and hold harmless Signet, including but not limited to its parent, subsidiaries, affiliates, licensors, subcontractors, agents, officers, directors, stockholders and employees, from all direct or third party losses, claims (including those alleged or asserted), obligations, liabilities, awards, judgments, fines, penalties, damages (including direct, indirect, consequential or punitive), settlement payments, costs, attorneys fees and expenses, including but not limited to public relations, investor relations and media costs to rehabilitate or prevent reputational damage (collectively, "Losses") in connection with, directly or indirectly arising from, Seller's performance under an Order, the VBA, this Supplier Manual or any incorporated writings, including but not limited to:

1. any breach, attempted breach, material mistake, or misrepresentation by Seller, its parent, subsidiaries, affiliates, licensors, agents, subcontractors, suppliers or employees, of its representations, warranties, covenants, agreements or obligations relating to an Order, the VBA, this Supplier Manual, any incorporated writings, or any agreement, document or report required to be delivered by Seller hereunder;

2. any claim, suit or action brought or asserted by any creditor, claimant, governmental body or other person asserting a claim against Signet or against any of the goods conveyed or to be conveyed, relating to goods or Seller's warranties of goods and arising as of or before the effective date of Seller's most recent VBA, whether such claim is presently known or unknown, choate or inchoate;

3. any act or omission, negligent or otherwise, of Seller or its parent, subsidiaries, affiliates, licensors, agents, subcontractors, suppliers, or employees, in connection with or related to Seller's performance or attempted performance relating to an Order, the VBA, this Supplier Manual, any incorporated writings or any agreement, document or report required to be delivered by Seller hereunder;

4. any failure by Seller to comply with applicable laws.

Seller agrees to procure, and shall submit proof to Signet upon request that Seller has procured and maintains:

1. commercial general liability insurance coverage of at least five million dollars per occurrence (or a higher amount as required by Signet) with an insurer that has an A.M. Best financial strength rating of A- or better ("Reputable Insurer");

2. commercial product liability insurance coverage with a Reputable Insurer of at least two million dollars per occurrence (or a higher amount as required by Signet);

3. all risk commercial asset and property insurance coverage with a Reputable Insurer substantially covering all buildings, equipment, materials and inventory that are used in furtherance of or that relate to Seller's performance hereunder;

4. commercial workers compensation insurance or its equivalent with a Reputable Insurer to indemnify Signet against Losses that may arise from employees or agents of Seller that may visit a Signet facility or store;

5. intellectual property infringement insurance coverage with a Reputable Insurer to indemnify Signet against Losses arising from any intellectual property (e.g. trademarks, copyrights, patents) rights, claims, warranties, or liabilities that relate to  Seller's performance hereunder.

If Signet delivers diamonds, gemstones, jewelry or components (collectively "Assembly Assets") to Seller for any reason, Seller must maintain sufficient insurance with a Reputable Insurer to cover the replacement cost of Assembly Assets from the time they are delivered to Seller until they are delivered back to the appropriate Signet facility or another location specified by Signet.  Seller must submit a current copy of Seller's Certificate of Insurance naming Sterling Jewelers Inc., Zale Delaware, Inc. or Zale Canada Co. as first loss payee anytime said Certificate of Insurance is updated or renewed and upon request by Signet. Seller's Certificate of Insurance must be sent to:

**Leslie Smith**
**Director, Strategic Sourcing and Manufacturing**
**375 Ghent Road**
**Akron, OH 44333**
**P: 330.668.5241**
**Leslie.Smith@signetjewelers.com**

## TEST PRODUCT

If Seller supplies Signet with goods that are to be tested by Signet ("Test Goods"), the following conditions apply:

1. Test Goods are consigned goods unless the Test Goods utilize a center stone supplied by Signet.
2. If Test Goods do not meet the predetermined sell-through as established by Signet in its sole discretion, unsold Test Goods may be returned to Seller by Signet, in its sole discretion, for full credit or memo credit.
3. If the Test Goods utilizing a center stone supplied by Signet are returned to Seller, Seller has the option to keep or return this stone for credit

## SHELF STOCK

Signet will forecast and forward projected sales for core programs to Seller at regular intervals. Seller must maintain specific amounts of goods as shelf stock in order to expedite delivery to

Signet.  The specific shelf stock amounts that are required will fluctuate to coincide with the increases or decreases in the forecasted sales activity.

Seller must maintain a strong shelf stock position for any goods that are promoted or advertised by Signet, especially those goods which may exhibit unpredictable sales activity.

If Signet utilizes Shelf Stock Requirement Forms ("SSRF") or similar writings to specify the shelf stock requirements for Seller.  Those forms or writings are automatically incorporated by reference into the VBA and this Supplier Manual.  The SSRF will identify 1) the specific styles or SKUs subject to the requirements, 2) the quantity required and 3) the date(s) the shelf stock must be available for delivery.

Shelf stock goods must be available and held in the United States during the prescribed period. Further, Signet reserves the right to periodically examine the actual shelf stock inventory to verify its quality and readiness for immediate delivery.

## DISPLAY ALLOWANCE

If a specific merchandise program is developed that requires an in-store display unit for goods supplied by Seller, the full cost of the display units will be charged to the Seller.  If a display is developed that will house goods from multiple suppliers, Seller will only be charged a prorated cost for the display units based upon the respective product exposure.  If Seller provides in-store display units to Signet for goods supplied by Seller, Seller hereby transfers personal property ownership of the tangible display units to Signet.

Prior to the development of a display unit, Seller will be provided with a prototype or illustration of the display and an estimate of the display cost.

Additionally, Seller will be charged for display units required for new store openings and for the replacement of displays that are obsolete due to normal wear.

## CONTRIBUTIONS

Seller and Signet agree that the contributions as further explained below are discounts off the purchase of goods in each Order.  These discounts, which Signet takes as a set-off or deduction from future invoice payments as described below, are necessary for Signet to continue its extensive advertising and promotional efforts which may include (but are not limited to) television, radio, catalogs, direct mail, promotional point of purchase materials, incremental markdowns, focused sales training and operation sales force initiatives.  Seller agrees that Signet will not provide any service whatsoever to Seller as a result of this discount.  Signet will not advertise, market, or promote the name of Seller in any way.  The discount(s) that Signet receives from Seller, Signet's other vendors, as well as allocations from Signet's own budget are all aggregated to fund Signet's own marketing expenses for Signet's retail jewelry sales, and consequently, it is not possible for Signet to provide marketing invoices or expense reports that could be attributed to any discount(s) taken against Seller's invoices.  Pricing for all goods sold by Signet, including but not limited to all discounts, markdowns, credits, promotions, offers or other price adjustments, are in Signet's sole discretion.

If applicable to Seller as indicated on the most recent VBA signed by Seller, the promotional assistance contribution ("PAC") is a quarterly vendor contribution on the cost of goods sold

(commonly known as COGS) for all complete* goods supplied by Seller including goods supplied on consignment.

If applicable to Seller as indicated on the most recent VBA signed by Seller, the vendor contribution allowance ("VCA") is a quarterly vendor contribution on the cost of all net loose stone purchases by Signet.

These contributions, if any, will be calculated at the end of each calendar quarter and charged against invoice(s) beginning in the month directly following the calendar quarter in which the contribution accrued (e.g. Seller charged in April for contribution on applicable activity from January to March).

(*) Complete – should an item incorporate both Seller and Signet supplied components (i.e., an engagement ring with a Signet supplied center diamond), PAC will be taken only on portion supplied by Seller.

## NEW STORE ALLOWANCE

Seller agrees to reimburse Signet for a portion of the expenses that Signet incurs through stocking net new store openings with applicable goods supplied by Seller.  The applicable goods for purposes of this subsection shall be the cost of all goods (at Signet's weighted average cost) supplied by Seller that were present in a new store operated by Signet when it opened but excluding clearance, consignment, special orders and loose diamonds for assembly merchandise ("Applicable Goods").   Total new store openings for the purposes of this subsection shall be the total number of all stores in a given brand/concept that Signet opens in a fiscal year ("Total New Store Openings").  Net new store openings shall be the number of Total New Store Openings remaining after subtracting any store closures of the same brand/concept that occurred in the same fiscal year and shall not be less than zero ("Net New Store Openings").

At the end of each of Signet's fiscal years and at the termination of this VBA, Signet will examine the number of Total New Store Openings throughout the fiscal year and determine what amount of Applicable Goods supplied by Seller were present in each new store at the time it opened.  At the store banner/concept level, the total amount of Seller's Applicable Goods will then be divided by the number of Total New Store Openings to arrive at an average amount of Seller's Applicable Goods per new store.  The quotient from the preceding sentence will be multiplied by the number of Net New Store Openings to determine the amount of Seller's Applicable Goods that Signet used to stock Net New Store Openings.  Seller agrees that Signet may chargeback to Seller 10% of the total amount of Seller's Applicable Goods that Signet used to stock Net New Store Openings

## SELLING DIRECT TO CONSUMERS POLICY

Due to the rapidly changing nature of retailing, and in particular the jewelry industry specifically, Signet feels it is important that we convey our views of the marketplace to our suppliers.

To those vendors who are establishing or have established traditional retail facilities, sell directly to consumers on the internet or TV shopping networks, participate in the sale of jewelry products (TV or internet), we firmly believe that our entire retail operation creates a synergy unsurpassed in the retail jewelry industry. Signet's geographic spread, diverse store operating formats, its stable industry-experienced management team together with our well trained, highly motivated sales personnel and sophisticated information systems gives us a superior

position in the retail jewelry industry.  We did not achieve this position overnight and we are constantly reviewing our total operation to maintain and improve our position.  The retail jewelry industry is highly competitive requiring us to make appropriate changes when warranted.  We trust you recognize this competitive spirit.

It is important to keep in mind that our retail stores maintain an adequate breadth of merchandise (including inventory purchased from you), offer customers the opportunity to examine the jewelry before purchase, provide trained sales associates to deliver prompt and courteous customer assistance and offer service facilities for professional jewelry repair.  While we recognize your right to sell through whatever distribution channels you desire, Signet simply believes it is the best of these channels.  To that extent, we must carefully consider any effort by a manufacturer to sell directly to consumers or participate in sales directly to consumers.  Any direct sales to the consumer that you make or participate in changes our relationship from vendor/customer to one of competitors, which will cause us to carefully reconsider our business relationship with you.  We urge that you give careful consideration to your retail strategies so as not to jeopardize what has worked for both of us in the past.

## CONFIDENTIALITY

Seller acknowledges and agrees:

1.  that: (i) it will have knowledge of and will receive Confidential Information (as defined in subsection [2] below) from Signet and its affiliates, which has been or will hereafter be developed by and/or for Signet representing a key feature of value to Signet; (ii) Signet's Confidential Information is not generally known as held by the Signet's competitors; (iii) the Confidential Information is proprietary and valuable and provides Signet with a competitive edge although it may not be "trade secrets" in all respects under prevailing judicial interpretations; (iv) Seller may have access to and establish working relationships with employees of Signet who have been trained by and are valuable employees; and (v) Signet may suffer severe injury to its business which would be difficult or impossible to calculate in amount if this Confidential Information were known, possessed and/or used by a competitor.

2.  to not use for its own benefit or purposes or for the benefit or purposes of any other person, corporation or business organization, entity or enterprise, or disclose in any manner to any person, corporation or business organization, entity or enterprise the following, which shall specifically include, but shall not be limited to, information, whether in written, documentary, graphic, oral, electronic, computer readable or any other form whatsoever, relating to any trade secret, information, data, know-how or knowledge, financial information, marketing information, lists of customers and potential customers, special needs of customers, sales methods, price lists, pricing information, research, vendor information, product information, purchasing information, cost information, business contracts, records, draft documents, draft correspondence, correspondence, policy manuals, inventions, secret processes, systems of manufacture, discoveries, drawings, data sheets, process conditions, plans, methods of doing business, strategies, methods of operation, product formulations, promotions, promotional tie-ins, new product introductions, marketing plans, product concepts, videotapes, audio cassettes, diskettes, software, confidential or proprietary third party or affiliate information, information on new products and services being researched or developed by Signet or its affiliates, or the presentation, features, performance, utility or functionality of the same and employee information (collectively referred to herein as the "Confidential Information") belonging to, or relating to the affairs of Signet and its affiliates or that Seller received through its association with Signet and its affiliates. Confidential

Information also includes any and all data, information or other material in whole or part developed, arising, or otherwise derived, by Signet and its affiliates, Seller or otherwise, from Confidential Information furnished to Seller.  Confidential Information shall not include: (a) such information, data or knowledge that was known to the Seller prior to the time its association with Signet began, (b) was in the public domain at the time of disclosure, (c) any such information, data or knowledge that has become generally available to the public through no fault of the Seller, or (d) information, data or knowledge subsequently disclosed to Seller by a third person or entity where such third party is without an obligation of confidentiality, (e) information, data or knowledge that is independently developed by Seller without breach of section or any use of Confidential Information, or (f) information, data or knowledge disclosed by Seller with the prior written approval of Signet.  The existence of the relationship between Seller and Signet and any discussions, negotiations, strategies and agreements they have entered into or may hereafter enter into also constitute Confidential Information of Signet.

3.  that all Confidential Information shall remain the property of Signet, and Seller agrees:  (a)  to maintain and protect all Confidential Information (including all portions or copies thereof) against theft, damage, loss, or unauthorized access in at least the same manner as its own proprietary and confidential information is maintained and protected; but in no event shall Seller use less than reasonable care in its efforts to maintain and protect the Confidential Information, and (b) except as specifically permitted hereunder or as specifically consented to in writing by Signet, not to directly or indirectly disclose, transfer, exploit, copy, modify, or otherwise reproduce any Confidential Information at any time during or after the period of relationship between the parties. It is contemplated that in the course of their relationship, a party may need to communicate some Confidential Information to its employees, affiliated companies, subcontractors, attorneys, and advisors.  Prior to disclosing any Confidential Information to an employee or to its affiliated companies, subcontractors, attorneys, and advisors, Seller shall (a) inform such employee, affiliated companies, subcontractors, attorneys, and advisors of the confidential nature of such information and not to use the Confidential Information except for the business purpose for which the Confidential Information was disclosed, (b) make such employee, affiliated companies, subcontractors, attorneys, and advisors aware of his or her obligation to keep the same confidential, and (c) make sure that each employee, employees of an affiliate company, subcontractors, attorneys, and advisors have previously agreed in writing to maintain the confidentiality of any third party confidential information during and after such employee's relationship with Seller, which writing shall contain obligations that are no less protective than the degree of care Seller uses to protect its own confidential information, but in no event less than reasonable care.

4.  that during the term of this Agreement and for a period of one year after termination of the Agreement, Seller shall not, directly or indirectly, without the prior written consent of Signet, solicit or attempt to solicit, contract with, or employ or offer employment to any employee of Signet or its affiliates with whom the Seller had direct contact with or was made aware of as a result of work performed under the Agreement. The preceding obligation shall apply to individuals who within six months of the date of such action was an employee of Signet.

5.  that in the event that the Seller becomes legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, investigative demand or similar process) to disclose any of the Confidential Information of Signet, Seller covenants to use its best efforts to provide Signet with prompt written notice (at least 15 business days) via overnight courier to the attention of Signet General

Counsel so that Signet may seek a protective order or other appropriate remedy and/or waive compliance with this section.  In the event that such protective order or other remedy is not obtained, or that Signet waives compliance with this section, Seller covenants to furnish only that portion of the Confidential Information which it is legally required to disclose and will exercise its best commercial efforts to obtain confidential treatment for any Confidential Information so disclosed.

6. that Seller's obligations under this Agreement and rights with respect hereto will survive any termination of the parties' relationship indefinitely.  Upon the earlier of receipt of a written request from Signet or its affiliates, for any reason, or the termination of the particular business purpose for which the Confidential Information was disclosed, Seller shall promptly return to Signet any and all Confidential Information it received from Signet, or at the Seller's option, destroy such Confidential Information except in the Seller's computer back-ups (which shall be treated as Confidential Information of Signet for so long as they are in Seller's possession). Any notes or work product developed or otherwise derived from the Confidential Information by Seller and which constitute Confidential Information, shall be destroyed by the Seller and may not be used in any manner thereafter.  Upon request, Seller shall certify, in writing, to Signet as to its full compliance with this provision.

7. that Signet makes no representation or warranty and accepts no liability in respect of the accuracy or completeness of any or all of the Confidential Information and shall have no liability for Seller's use of the Confidential Information nor for any claims of third parties howsoever arising from Seller's use or possession of any Confidential Information or as a result of Seller's reliance on any Confidential Information, as disclosed or may be modified by Signet or its affiliates.  Seller understands and agrees that any Confidential Information including, without limitation, product, marketing, financial, or other plans, is subject to change without notice at any time and that Signet shall have no obligation to execute such plans and shall have no liability as a result of any change to such plans unless Signet has agreed otherwise in some other writing or agreement.

## CONSEQUENTIAL DAMAGES

In no event, whether as a result of breach of contract, warranty, guarantee, indemnity, tort, including negligence, strict liability or otherwise, shall Signet (including but not limited to its parent, subsidiaries, affiliates, licensors, subcontractors, agents, officers, directors, stockholders and employees) be liable to Seller for indirect, special, incidental, consequential or exemplary damages, including but not limited to, the loss of profits or revenue, loss of use of the equipment or any associated equipment, costs of capital, cost of substitute equipment, facilities or services, down time costs, costs in excess of estimates, loss of opportunity, loss of data, loss of goodwill, cost of purchased or replacement power, governmental penalties or sanctions imposed on Signet and or claims of customers of Seller for such damages.  Seller agrees that Seller's sole remedy under each and every Order shall be limited to the net profit Seller would receive under the respective Order.  Seller agrees this section is not a penalty and damages would otherwise be uncertain as to the amount and difficulty of proof and this section expresses the true intention of the parties.

## RELATIONSHIP OF THE PARTIES

Nothing contained in the VBA or this Supplier Manual contained shall be construed (i) to constitute the parties as partners, joint venturers or co-owners; (ii) to constitute an employer-employee relationship; (iii) to constitute a principal-agent relationship; or (iv) to constitute a guaranty or assurance of any future or concurrent utilization of services of one party by the other party.

## SUCCESSORS AND ASSIGNS

The terms and conditions of the VBA and this Supplier Manual shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors and assigns.  Neither party may assign obligations under the VBA or this Supplier Manual without the prior written consent of the other party, which will not be unreasonably withheld.

All of the duties, covenants, conditions and provisions of the VBA and this Supplier Manual shall be binding upon and shall inure to the benefit of the parties hereto and their respective parent companies, subsidiary companies, affiliate companies (as such term is defined in the Securities Act of 1933), representatives, successors and assigns.

## NO TRANSFER

Nothing contained in the VBA or this Supplier Manual shall be construed as granting or conferring, by implication or otherwise, any right, title, or ownership, by license or otherwise, in Signet's trademarks, trade secrets, inventions, copyrights, patents (pending or registered), or other intellectual property or proprietary rights.

## HEADINGS AND LEGEND

The headings and legend, including any associated markings or highlights, in this Supplier Manual have been added for convenience only and shall not be used to modify, define, limit, expand or construe the meaning, scope or intent of any provisions contained in the VBA or this Supplier Manual.

## NO FINDER'S FEE

Both parties represent that they have dealt with no and will deal with no brokers or finders with respect to the VBA, this Supplier Manual, or provision of any goods and services to the other party and that there are no finder's fees, brokerage commissions, commissions, rebates, vendor payments, or similar payments owed or to be paid to either party as a result of the provision of services.

## SEVERABILITY

If any term of this Supplier Manual or the VBA is to any extent invalid, illegal, or incapable of being enforced, such term shall be excluded to the extent of such invalidity, illegality, or unenforceability; all other terms hereof shall remain in full force and effect.

## NON-EXCLUSIVITY

Nothing in the VBA or this Supplier Manual shall obligate Signet to use Seller exclusively for any purpose including the provision of goods and/or services.

## OWNERSHIP & LICENSING OF PRODUCTS

During the course of Seller's relationship with Signet, there are different ways in which styles, patterns, compositions, works of art, ideas, drawings, designs or design elements (collectively "Styles") relating to goods or other merchandise are developed and designed.  This Section describes the three main categories of Styles and how they are developed by Seller and Signet, and Seller's and Signet's respective ownership and licensed rights in those Styles.

1.      If Seller creates or develops new Styles for Signet, at the direction of Signet, or its officers, directors, employees or agents (collectively, "Signet Styles"), Signet shall own all Intellectual Property Rights in the Signet Styles.

2.      If Seller creates or develops new Styles based on Seller Styles (defined below) that are modified or customized at the direction of, for or on behalf of Signet ("New Styles"), Seller agrees and acknowledges that all Intellectual Property Rights (defined below) in the New Styles are owned by Signet.  Seller shall manufacture and/or provide such New Styles to Signet on an exclusive basis, and Seller agrees and acknowledges that Signet may manufacture or have manufactured the New Styles at any time, at Signet's sole discretion.  Seller hereby grants Signet a non-exclusive, irrevocable, royalty free, fully paid up, sublicensable, transferrable, worldwide license to use the Seller Styles as necessary to incorporate into the New Styles, and to sell, offer for sale, advertise (across all forms of media), manufacture or have manufactured by a third party, New Styles.  If Signet and its affiliates should permanently discontinue the sale of New Styles, Signet grants Seller a non-exclusive, irrevocable, royalty free, fully paid up, non-sublicensable, non-transferrable, worldwide license to sell, offer for sale, advertise (across all forms of media), manufacture or have manufactured by a third party, New Styles.

3.      If Seller creates Styles independently from Signet, without any input, feedback or modifications from Signet ("Seller Styles"), Seller owns all Intellectual Property Rights in such Seller Styles, if and to the extent there are any protectable Intellectual Property Rights in the Seller Styles. Seller agrees to provide Seller Styles to Signet on an exclusive basis if indicated in the applicable Product Linesheet, PIW or Purchase Order.  To the extent Seller has any protectable Intellectual Property Rights in Seller Styles, Seller hereby grants Signet a non-exclusive, irrevocable, royalty free, fully paid up, sublicensable, transferrable, worldwide license to sell, offer for sale, advertise (across all forms of media), manufacture or have manufactured by a third party, Seller Styles if:

a)  Seller breaches a material provision of the VBA or this Supplier Manual;
b)  Seller is unable or unwilling to supply Seller Styles or Seller cannot provide the requested volume to Signet on or before the due date specified in the order;

67

    c)   Seller is no longer able to comply with Signet's legitimate and reasonable business needs and requirements as they may change from time to time, however, the Parties agree to meet and confer in good faith to resolve the compliance issues;

    d)   The price (inclusive of duty, shipping, or other cost) of Sellers Styles is no longer competitive with like product, however, the Parties agree to meet and confer in good faith to attempt to reach a price agreement;

    e)   More than eighteen (18) months have passed since Signet first placed an Order with Seller for Seller Styles and Signet has subsequently placed at least five (5) additional Orders that included Seller Styles; or

    f)   Signet has placed Order(s) with Seller for Seller Styles totalling One Hundred Thousand Dollars ($100,000) or more in the preceding eighteen (18) months.

Nothing in this subsection shall prohibit Seller from manufacturing New Styles or Seller Styles for sale by third parties if Signet permanently discontinues the sale of said New Styles or Seller Styles.

In the case of New Styles and Signet Styles, Seller acknowledges and agrees that the New Styles and Signet Styles and all Intellectual Property Rights in and to each of such Styles, are exclusively owned by Signet. To the extent Seller owns or retains any Intellectual Property Rights in New Styles or Signet Styles, Seller hereby transfers, conveys and assigns to Signet, all right, title and interest in such Styles.  Seller shall cooperate with Signet to perfect Signet's ownership rights in the New Styles and Signet Styles, including executing any assignment therefor, and will obtain, at its expense, such assignments from Seller's employees, agents, and contractors as necessary.

Signet shall be free to make or have made any and all New Styles and Signet Styles by any Seller Signet selects, and Seller shall have no rights to sue/stop production, etc.

For purposes of this subsection, Seller hereby agrees and covenants that it will not commence any claim, suit or cause of action against Signet on the grounds that Signet has manufactured or has had manufactured New Styles or Signet Styles, or has sold or advertised for sale the New Styles and/or Signet Styles.  The foregoing covenants by Seller not to commence any claim, suit, or cause of action against Signet shall also extend to any and all third parties that Signet may contract with to have the Style(s) manufactured.

Seller acknowledges and agrees that Signet has spent significant time and resources in developing and promoting its products and designs.  Seller shall not infringe or misappropriate Signet's Intellectual Property Rights. Further, Seller shall not attempt to trade off of the goodwill associated with any products or designs owned by Signet or sold exclusively by Signet.   This includes, without limitation, creating, manufacturing or selling products and designs that are substantially similar or are "knock-offs" of products or designs owned by Signet or sold exclusively by Signet.

Notwithstanding anything in this Supplier Manual to the contrary, effective as of the later of (i) the last Order date or (ii) the termination of the most recent VBA between Signet and Seller (collectively "Final Purchase"), Seller hereby grants to Signet and its subsidiaries and affiliates, for a period of twenty-four (24) months after the Final Purchase, a worldwide, royalty-free, non-transferable, non-exclusive irrevocable license to use Seller's trademarks and copyrights in connection with the continued business operation, in a manner consistent with Signet's use of Seller's trademarks and copyrights in the business prior to the Final Purchase, including, but not limited to (i) in connection with the manufacture, sale, distribution, promotion, advertising and marketing of the goods and (ii) on Signet's existing signage, business cards, packaging, letterhead, invoice forms, websites (internet and intranet), advertising, marketing and promotional materials, machinery and equipment, inventory and other documents,  materials containing or bearing any Seller trademarks, copyrights or the like ("Selloff Period").  Further, in addition to any rights provided for herein or at law, at any time during the Selloff Period, Signet shall have the right to resell any product(s) to a third party reseller, and Seller shall, if

requested, execute a waiver and / or release for the benefit of Signet and / or the third party reseller.  Such third party reseller shall have the same Selloff Period rights as Signet.  If conditions, covenants or agreements described in this subsection are contrary to conditions, covenants or agreements contained in a separate licensing or another agreement between Signet and Seller, the conditions, covenants or agreements contained in the separate licensing or other agreement between Signet and Seller take precedence over this subsection.

For purposes of this subsection of the Supplier Manual, "Intellectual Property Rights" means all forms of proprietary rights, titles, interests, and ownership relating to patents, copyrights, design rights, trademarks, trade dress, trade secrets, know-how, mask works, droit moral (moral rights), whether registered or unregistered, and all other intellectual property and similar rights of every type that now exist or may exist in the future in any jurisdiction, including without limitation all applications and registrations for any of the foregoing, including renewals, and any modifications, derivations, improvements or adaptations thereof.

## SURVIVAL

The following sections or subsections shall survive termination of this Agreement:

| Section | Subsection |
|---------|-----------|
| 1 | Supplier Code of Conduct |
| 2 | Signet Responsible Sourcing Protocol Compliance |
| 2 | Assay |
| 4 | Quality Obligations |
| 4 | Termination of an Order |
| 6 | Delivery |
| 6 | Freight Policy |
| 9 | Payment |
| 9 | Invoice Submission |
| 10 | Warranty |
| 10 | New Goods Deemed Defective |
| 10 | Goods That Pass Initial Quality Control but are Later Deemed Defective |
| 10 | Customer Return Policy |
| 11 | Indemnification and Insurance |
| 11 | Display Allowance |
| 11 | Contributions |
| 11 | Confidentiality |
| 11 | New Store Allowance |
| 11 | Consequential Damages |
| 11 | Severability |
| 11 | Ownership & Licensing of Products |
| 11 | Survival |
| 11 | No Waiver |
| 11 | Governing Laws and Venue |

## NO WAIVER

The failure of Signet at any time or times to demand strict performance by Seller of any of the terms or conditions of this Agreement will not be construed as a continuing waiver or relinquishment of the right to do so, and Signet may, at any time, demand strict and complete performance of this Agreement.  To be enforceable, a waiver must be in writing and signed by an authorized representative of Signet.

## REPRESENTATION BY COUNSEL & CONSTRUCTION

Each Party acknowledges that it has had the opportunity to seek the advice of independent counsel of its own choosing in the negotiation and execution of this Agreement, and is not relying upon any inducements, promises, or representations made by any other Party or any of its officers, employees, agents, or attorneys other than as set forth in this Agreement.  This Agreement will be construed neutrally and no provision of this Agreement will be construed in favor of or against any Party on the ground that such Party or its counsel drafted the provision.

## GOVERNING LAWS AND VENUE

The VBA and this Supplier Manual shall be construed and enforced pursuant to the laws of the State of Ohio, without giving effect to the principles of conflicts of laws thereof.  The parties agree that any dispute concerning the VBA or this Supplier Manual shall be brought in a Court of competent jurisdiction in Summit County, State of Ohio.

## COUNTERPARTS; FACSIMILE AND ELECTRONIC SIGNATURES

The VBA, including amendments, deletions, or modifications to this Supplier Manual made incident thereof may be executed in counterparts (and by electronic or facsimile signatures), each of which shall be deemed an original and all of which shall constitute one and the same original Agreement.

# APPENDICES