## CONSIGNMENT AGREEMENT

This Consignment Agreement ("Agreement") made as of this 10th day of August, 2018 by and among **UNIQUE DESIGNS, INC. d/b/a Kiran Jewels, SDIL, Interjewel USA and/or Mercury Ring,** a New York corporation with its principal office at 521 Fifth Avenue, Suite 820, New York, New York 10175 ("Consignor") and the entities listed on Exhibit A hereto (individually and collectively, "Consignee").

### WITNESSETH:

Whereas, Consignee utilizes and sells diamonds, gold and jewelry in its operations; and

Whereas, Consignor is willing to consign jewelry inventory to Consignee consisting of finished jewelry, loose diamonds, loose colored gemstones and other precious and semiprecious jewelry and gemstone inventory (herein referred to as the "Consigned Merchandise") for sale or return by Consignee constituting a consignment, pursuant to the following terms and conditions and other documents referred to herein.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Consignor and Consignee (collectively, the "Parties" and individually, a "Party") hereby agree as follows:

1. The provision of Consigned Merchandise by Consignor to Consignee and the rights and responsibilities of the Parties in respect thereof is governed by this Agreement, which hereby supersedes any other consignment agreement between Consignor and any one or more of the Consignee entities. Subject to any variations agreed in writing by an authorized Consignee representative, such terms and conditions will govern all Consigned Merchandise from Consignor. Consignor acknowledges that this Agreement expressly incorporates the terms and conditions of the purchase and sale documents incorporated by reference on Exhibit A (collectively "Purchase Related Agreements"), as such documents may be amended or modified from time to time. In the event of conflicts among terms and conditions present in this Agreement or other agreements among the Parties, the order of precedence, unless otherwise specified, shall be (a) any licensing agreement(s), (b) the Purchase Related Agreement(s), (c) this Agreement, (d) non-disclosure agreement(s), (e) the purchase orders, and (f) and any other written agreements.

2. The terms of this Agreement prevail over any conflicting terms or conditions of Consignor contained in any other documentation, including any of Consignor's general terms and conditions contained in any Confirmation Memo (defined in paragraph 4 below) or any other Consignor documents related to the Consigned Merchandise. Unless consent is provided in writing, Consignee expressly objects to any additional or conflicting terms and conditions of Consignor beyond what is described in this Agreement.

3. Consignee will from time to time issue purchase orders to Consignor for Consigned Merchandise. Consignor's acceptance or rejection of any purchase order received from Consignee shall be at Consignor's sole option and/or discretion. Consignee's purchase orders shall set forth the expected delivery date, shipping terms and

shipping location (individually, "Consignee Location" and collectively "Consignee Locations"). The Parties will agree to the types and quantities of Consigned Merchandise for each Consignee Location. Based on additional purchase orders issued by Consignee, acceptance or rejection of which shall also be at Consignor's sole option and/or discretion, Consignor will deliver to Consignee on consignment such types and quantities of Consigned Merchandise reflected in the Confirmation Memo accompanying the Consigned Merchandise. Consignee shall inspect the Consigned Merchandise and shall notify Consignor of any items that are damaged, non-conforming or missing or that were not requested to be delivered, and shall return any such Consigned Merchandise promptly at Consignor's cost. Consignor agrees to accept and to promptly replace all defective Consigned Merchandise, subject to availability.

4. Consignor shall prepare a document labeled "Confirmation Memo" which will accompany each shipment of Consigned Merchandise to Consignee. The Confirmation Memo shall generally describe and identify the items of Consigned Merchandise contained in each shipment. For Consignee's Sterling Entities (as defined in Exhibit A), the Confirmation Memo shall also set forth the prices to be charged by Consignor and to be paid by Consignee for the Consigned Merchandise, regardless of Consignee's retail sale price, which Consignee shall determine in its sole discretion.

5. For Consignee's Sterling Entities: Consignee shall, no later than fifteen (15) days after the end of each retail month, send to Consignor, by regular mail, email or other mutually agreed upon means, a sales report listing the piece(s) of Consigned Merchandise sold during that retail month (the "Sales Report"). Upon receipt of the Sales Report, Consignor shall promptly prepare an invoice, setting forth the payment due from Consignee based upon the Sales Report. Consignee shall remit payment to Consignor per the terms established in the Vendor Buying Agreement between the Parties based on the receipt of such invoice, subject to resolution of any adjustments to the invoice. IF CONSIGNOR DOES NOT NOTIFY CONSIGNEE OF ANY DISCREPANCIES OR OMISSIONS WITHIN THIRTY (30) DAYS OF ITS RECEIPT OF A SALES REPORT, SUCH REPORT SHALL FOR ALL PURPOSES BE CONCLUSIVELY DEEMED CORRECT AND SHALL BE CONCLUSIVE AND BINDING ON CONSIGNOR.

For Consignee's Zale Entities (as defined in Exhibit A): Following the end of each retail month, Consignee shall furnish to Consignor a sales report listing the piece(s) of Consigned Merchandise sold during that retail month and their corresponding harmonized weighted average cost (WAC) (the "Sales Report"). Consignee will subsequently remit payment for the net amount payable per the Sales Report on the following biweekly payment run. IF CONSIGNOR DOES NOT NOTIFY CONSIGNEE OF ANY DISCREPANCIES OR OMISSIONS WITHIN THIRTY (30) DAYS OF ITS RECEIPT OF A SALES REPORT, SUCH REPORT SHALL FOR ALL PURPOSES BE CONCLUSIVELY DEEMED CORRECT AND SHALL BE CONCLUSIVE AND BINDING ON CONSIGNOR.

6. The Consigned Merchandise will be shipped by Consignee to Consignee's stores or approved distribution facilities for sale to Consignee's customers. Absent the written consent of Consignor, the Consigned Merchandise shall be held by Consignee solely at Consignee Locations. The Consignee will take such reasonable actions as may be necessary to show at all times that the Consigned Merchandise is the property of the Consignor, such as assigning unique stock keeping units as utilized in the ordinary course of one or more of Consignee's business operations. Consignee shall not mix the

Consigned Merchandise with any third-party goods without being adequately identified as belonging to Consignor. The Consignee will make appropriate entries in its books showing that the Consigned Merchandise is held for the account of the Consignor.

7. Title to the Consigned Merchandise delivered to Consignee shall at all times remain with Consignor until withdrawn from stock by Consignee and sold to its customers. When Consignee sells the Consigned Merchandise to a customer, title to the Consigned Merchandise shall pass from Consignor to Consignee and immediately thereafter from Consignee to the customer. Consignee may sell or return the Consigned Merchandise in the ordinary course of its business. Consignee may purchase or convert to asset/invoice any or all of the Consigned Merchandise only with the written consent of Consignor and after having been provided with ten (10) days written notice by Consignee of its desire to purchase said merchandise.

8. Consignee accepts all risks of loss to the Consigned Merchandise from the time accepted at Consignee's location, except that risk of loss for any Consigned Merchandise returned to Consignor shall pass to Consignor from the time of delivery to the carrier.

9. Consignee shall insure the Consigned Merchandise for its full value (the price Consignee pays Consignor) for and against all risks of loss customarily insured against by Consignee.

10. Consignee shall pay all applicable VAT, sales, use or other similar taxes levied by any duly constituted taxing authority upon the sale of the Consigned Merchandise to Consignee's customers, exclusive, without limitation, however, of taxes based upon the income of Consignor or property taxes based upon the value, as determined by the relevant tax law of the respective taxing authority, of the Consigned Merchandise, which such income and/or property taxes shall be paid by Consignor.

11. At the request of Consignee, Consignor shall provide all information and documentation that may be required by Consignee for purposes of importing the Consigned Merchandise into a particular country, including information relating to the tariff classification, origin, duties and customs valuation of the Consigned Merchandise. This also includes, but is not limited to, NAFTA and other Certificates of Origin or similar statements or documentation as applicable for purposes of preferential duty treatment.

12. Consignee shall, no more often than twice in each twelve (12) month period, permit Consignor and the representatives of Consignor, at reasonable hours and upon reasonable notice, to inspect Consignee's books and records relating to the Consigned Merchandise and to make abstracts or reproductions of such books and records; provided however, that Consignee shall promptly provide Consignor with a report showing the location of the Consigned Merchandise upon Consignor's request.

13. Consignor represents and warrants to Consignee that:
    a. it is duly organized, validly existing and in good standing in the jurisdiction of its formation;

    b. it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement;

    c. it has the full right, power and authority to enter into this Agreement, to grant the rights and licenses, if any, required to fulfill this Agreement, and to perform its obligations under this Agreement;

    d. the execution of this Agreement by its representative whose signature is set forth below has been duly authorized by all necessary actions;

    e. when executed and delivered by the Parties, this Agreement will constitute a legal, valid and binding obligation of Consignor, enforceable against Consignor in accordance with its terms;

    f. it is in material compliance with all applicable laws relating to this Agreement, the Consigned Merchandise and the operation of its business;

    g. it owns all right, title and interest in, or has a valid license to use, any intellectual property rights related to the Consigned Merchandise and such merchandise does not infringe on the intellectual property rights of any third party;

    h. it is solvent and is paying all of its debts as they become due; and

    i. any financial information that Consignor has provided to Consignee is true and accurate and fairly represents Consignor's financial condition.

14. Consignee represents and warrants to Consignor that:

    a. it is duly organized, validly existing and in good standing in the jurisdiction of its formation;

    b. it is duly qualified to do business and is in good standing in every jurisdiction in which such qualification is required for purposes of this Agreement;

    c. it has the full right, power and authority to enter into this Agreement, to grant the rights and licenses, if any, required to fulfill this Agreement and to perform its obligations under this Agreement;

    d. the execution of this Agreement by its representative whose signature is set forth below has been duly authorized by all necessary actions;

    e. when executed and delivered by the Parties, this Agreement will constitute a legal, valid and binding obligation of Consignee, enforceable against Consignee in accordance with its terms;

    f. it is in material compliance with all applicable laws relating to this Agreement, the Consigned Merchandise and the operation of its business;

    g. it is solvent and is paying all of its debts as they become due; and

    h. any financial information that it has provided to Consignor is true and accurate and fairly represents Consignee's financial condition.

15. The Parties hereto agree that this Agreement creates a consignment and that all transactions hereunder shall constitute consignments of the Consigned Merchandise and not the purchase and sale of merchandise by Consignee (other than upon termination of this Agreement as herein provided in paragraphs 16 and/or 18 or the purchase of Consigned Merchandise by Consignee as herein provided in paragraph

7); provided, however, that notwithstanding anything to the contrary contained herein, Consignor shall have no lien or security interest in proceeds, including, without limitation, certain credit card accounts, the receivables arising therefrom, and the further proceeds of, the Consigned Merchandise, and Consignor hereby disclaims and releases any such lien or security interest in such proceeds to the extent one is deemed to exist. In no event shall Consignor file any UCC or similar personal property registration financing statements without obtaining prior written approval and authorization from the Consignee of the form and content of the financing or security statement to be filed, which approval may be granted or withheld by Consignee in Consignee's sole discretion not to be unreasonably withheld. In the event Consignor files a financing or security statement without obtaining such prior written approval and authorization, Consignee is hereby authorized by Consignor, in Consignee's sole discretion, to terminate such filing or file an appropriate amendment. In no event shall any financing or security statement reference any claim to the assets of Consignee, nor shall the Consignor have any claim to assets of the Consignee or to the proceeds of the Consigned Merchandise. Any costs associated with such filings shall be paid by Consignor.

16. The term of this Agreement shall commence upon signing. The initial term shall be for a period of one (1) year and shall automatically renew for successive one (1) year terms unless and until this Agreement is terminated as provided in this paragraph 16 or as otherwise provided herein. This Agreement may be terminated by either Party for any reason at any time with or without cause upon ninety (90) days written notice to the other Party. Upon expiration of the ninety (90) day notice period, this Agreement shall terminate and Consignee shall have the right to purchase such items of the Consigned Merchandise as it may desire by sending to Consignor a statement of its desire to do so, which statement shall be deemed a Sales Report and which shall list those pieces of Consigned Merchandise that Consignee shall purchase and which shall be accompanied by payment therefor. The final accounting and payment between the Parties shall be made thirty (30) days after the termination date. Consignee shall return to Consignor, at Consignee's expense and risk, all Consigned Merchandise not so purchased, which risk shall terminate upon Consignor's receipt of the Consigned Merchandise.

17. This Agreement is not assignable by either Party without the written consent of the other Party, except Consignee may, without the written consent of Consignor: (1) assign this Agreement to: (a) an affiliate; (b) a successor by way of consolidation, merger or operation of law; or (c) a purchaser of all or substantially all of the Consignee's assets; and/or (2) add additional entities to this Agreement, upon thirty (30) days' written notice to Consignor.

18. In the event of the occurrence of any one or more of the following:

    a. Default in the payment or performance of any of Consignor's or Consignee's material obligations or agreements hereunder which continues uncured for more than fifteen (15) days after written notice thereof;

    b. Any representation or warranty made herein should prove to be false or misleading in any material respect; or

    c. Consignee shall (a) make an assignment for the benefit of creditors, (b) file or suffer the filing of any voluntary or involuntary petition under any applicable laws, regulations or rules that is not dismissed within 120 days, (c) apply for or permit the appointment of a receiver, trustee or custodian of any of its property or business, (d) make an admission of its inability to pay its debts as they become due; or (e) allow an attachment on any of the Consigned Merchandise delivered hereunder to continue sixty (60) days after Consignee receives written notice thereof;

then this Agreement and the obligations of Consignor and Consignee hereunder shall, at the Parties' option, terminate for cause, and Consignee shall, within thirty (30) days of such termination and at Consignee's option, (y) return to Consignor all Consigned Merchandise not heretofore purchased, or (z) purchase items of Consigned Merchandise as it may desire by sending to Consignor a statement of its desire to do so, which statement shall be deemed a Sales Report, and which shall list those pieces of Consigned Merchandise which Consignee shall desire to purchase, accompanied by full payment for the merchandise so purchased.

19. Without limiting Consignor's obligations, if any, under the Purchase Related Agreements or any other agreements among the Parties, Consignor and any and all of its subsidiaries, affiliates and permitted assigns (the "Consignor Indemnifying Parties"), shall jointly and severally indemnify, hold harmless and defend Consignee and any and all of its subsidiaries, affiliates, officers, directors, members, shareholders, employees, agents and permitted assigns (the "Consignee Indemnified Parties"), of and from any and all liability, damages, injury, claims, suits, proceedings, obligations, remedies, penalties, costs and expenses of any kind, including costs of enforcing this Agreement and pursuing insurance providers (including attorney's fees and disbursements, collectively, "Losses"), incurred by the Consignee Indemnified Parties, arising out of or relating to any claims, demands, actions, investigations, inquiries, assessments, subpoenas, audits, judgments or costs of any kind (collectively, a "Claim") relating to:

    a. a breach or non-fulfillment of any representation, warranty or covenant set forth in this Agreement by Consignor Indemnifying Parties or their agents and/or personnel;

    b. any negligent act or omission of Consignor Indemnifying Parties or their agents and/or personnel (including any recklessness or willful misconduct) in connection with the performance of its obligations under this Agreement;

    c. any bodily injury or death of any person or damage to real or tangible personal property caused by the Consigned Merchandise or the acts or omissions of the Consignor Indemnifying Parties or their agents/personnel;

    d. the failure by the Consignor Indemnifying Parties or their agents/personnel to provide information or correct information with respect to the Consigned Merchandise as may be required by Consignee pursuant to paragraph 10; or

    e. any failure by the Consignor Indemnifying Parties or their agents/personnel to comply with any applicable laws.

20. Without limiting Consignor's obligations, if any, under the Purchase Related Agreements or any other agreements among the Parties, the Consignor Indemnifying

6

Parties agree to jointly and severally indemnify, defend and hold harmless the Consignee Indemnified Parties from any and all Losses which Consignee Indemnified Parties may suffer as a result of any Claims related to alleged infringement of another person's jewelry designs or other intellectual property rights based on the Consigned Merchandise or accompanying materials.

If the Consigned Merchandise, or any part of the Consigned Merchandise, becomes, or in Consignor's opinion is likely to become, subject to a Claim that qualifies for intellectual property indemnification coverage under this paragraph 20, Consignor shall immediately notify Consignee in writing to cease using, reselling, marketing, advertising or promoting all or a part of the Consigned Merchandise, in which case Consignee shall immediately cease all use, resale, marketing, advertising and promoting of the Consigned Merchandise on receipt of Consignor's notice until the acceptable resolution of such Claim as mutually determined by the Parties.

21. If Consignee shall incur and directly pay for any Losses, Consignor agrees to reimburse Consignee for such Losses within fifteen (15) days after receipt of written notice and reasonable proof from Consignee of the incurring of such Losses.

22. Notwithstanding anything to the contrary in this Agreement, and without prejudice to any other right or remedy Consignee has or may have, Consignor agrees that Consignee and its affiliates shall have the right to set off or recoup, without prior notice to Consignor or its affiliates, any amounts owed to Consignor and/or Consignor's affiliates by Consignee and/or Consignee's affiliates against amounts owed to Consignee and/or Consignee's affiliates by Consignor and/or Consignor's affiliates, whether such amounts owed are matured, unmatured, liquidated, unliquidated or arise under this Agreement or otherwise. This right of set off includes but is not limited to Consignee's or Consignee's affiliates' ability sell or otherwise dispose of the Consigned Merchandise and apply the proceeds therefrom to satisfy any amounts owed to Consignee and/or Consignee's affiliates by Consignor and/or Consignor's affiliates. In addition, Consignee and/or Consignee's affiliates shall have the right to sell or assign any indebtedness or obligation, either owed to or by any Consignee and/or its affiliates, with respect to any Consignor and/or Consignor's affiliates, to effect any setoff provided for herein or for any other purpose.

23. Consignor agrees and warrants that for any Consigned Merchandise fabricated/repaired utilizing rough diamonds mined from January 1, 2003 onward, the diamonds will be or have been purchased from legitimate sources not involved in funding conflict and are in compliance with United Nations Resolutions and Canadian law. Consignor guarantees that these diamonds are conflict free, based on personal knowledge and/or written guarantees by the supplier of these diamonds. Consigned Merchandise fabricated/repaired from diamonds mined prior to January 1, 2003 is not covered by the Kimberly Process Certification Scheme or the Industry Warranty Program. Such Consigned Merchandise should continue to be subject to the "best efforts" assurance that has been in general use since August 2000 concerning the avoidance of conflict diamonds, i.e. that Consignor will not knowingly sell conflict diamonds and that, to the best of Consignor's ability, Consignor will undertake reasonable measures to help prevent the sale of conflict diamonds in any country covered by this Agreement.

24. Reference is made to the Interim Final Rule, codified at 31 C.F.R. Part 103, implementing the provisions of the USA PATRIOT ACT of 2001 applicable to dealers in precious metals, stones, or jewels. The Interim Final Rule defines a "dealer" in relevant part as "a person engaged within the United States as a business in the purchase and sale of covered goods [i.e., precious metals, precious stones, jewels, or finished goods deriving more than 50% of their value from precious metals, precious stones, or jewels] and who, during the prior calendar or tax year: (a) purchased more than $50,000 in covered goods; and (b) received more than $50,000 in gross proceeds from the sale of covered goods. Consignor represents that it has read and is familiar with the Interim Final Rule, that it complies with applicable portions thereof, and is a defined "dealer."

25. To the extent that Consigned Merchandise is delivered and sold in Canada, this section shall apply. Reference is made to the *Proceeds of Crime (Money Laundering) and Terrorist Financing Regulations* – SOR/2002-184, as amended ("Regulations"), implementing the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada)* –S.C. 2000, c.17, as amended ("Act"). The Regulations define "dealer in precious metals and stones" as "a person or an entity that, in the course of its business activities, buys or sells precious metals, precious stones or jewelry. It includes a department or agent of Her Majesty in right of Canada or of a province when the department or agent is carrying out the activity, referred to in section 39.1, of selling precious metals to the public." Every dealer in precious metals and stones that engages in the purchase or sale of precious metals, precious stones or jewelry in an amount of $10,000 or more in a single transaction, other than such a purchase or sale that is carried out in the course of, in connection with or for the purpose of manufacturing jewelry, extracting precious metals or precious stones from a mine or cutting or polishing precious stones, is subject to Part 1 of the Act. Such a transaction referred to in sections 39.2 and 39.3 includes the sale of precious metals, precious stones or jewelry that are left on consignment with a dealer in precious metals and stones. Every dealer in precious metals and stones that is subject to Part 1 of the Act and that receives an amount in cash of $10,000 or more in the course of a single transaction is required to report the transaction to the Financial Transactions and Reports Analysis Centre ("FINTRAC"), together with the information set out in Schedule 1, of the Regulations unless the cash is received from a financial entity or a public body. In addition, such dealer in precious metals and stones is required to report to FINTRAC where there are reasonable grounds to suspect that a transaction or an attempted transaction is related to the commission of a money laundering offence or terrorist activity financing offence. Such dealer in precious metals and stones must also report where it knows that there is property in its possession or control that is owned or controlled by or on behalf of a terrorist or a terrorist group. Consignor represents that it has read and is familiar with the Act and the Regulations, that it complies with applicable portions thereof, including the above mentioned reporting requirements, and is a defined "dealer."

26. To the best of Consignee's knowledge Consignee is not, and shall not become, a person or entity with whom Consignor is restricted from doing business with under all applicable regulations in which Consignor or Consignee conducts business under this Agreement, including but not limited to: (a) *Canada's Special Economic Measures Act, United Nations Act, Freezing Assets of Corrupt Foreign Officials Act* or *Criminal Code*, (b) the United States' Office of Foreign Asset Control ("OFAC") of the Department of the

Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, Executive Order (including, but not limited to, the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and (c) the United Kingdom's financial sanctions issued by the Foreign and Commonwealth Office and administered by HM Treasury. Such parties are referred to herein as a "Designated Person." To the best of Consignor's knowledge, Consignor is not, and shall not become, a Designated Person. To the best of Consignor's knowledge, the Consigned Merchandise is not, and has not ever been, property owned or controlled directly or indirectly by a Designated Person or by any person owned or controlled directly or indirectly by a Designated Person.

27. Consignor acknowledges that information about Consignee's business affairs, goods and services, forecasts, materials comprising or relating to intellectual property rights, trade secrets, third-party confidential information and other sensitive or proprietary information, and all advertising and merchandising procedures (including items purchased, quantities purchased, sell-through, gross margin, price point, and catalog and flyer displays of product) furnished to Consignor or to which Consignor has access or gains knowledge are trade secrets of Consignee and are designated as "Confidential Information." Consignor further acknowledges that in addition to the data and information described herein as being Confidential Information, Consignee may, from time to time, designate other information, whether written or oral, as being Confidential Information.

Consignor covenants and agrees to hold any Confidential Information received by it directly or indirectly through its agents, employees or any other person, from Consignee in strictest confidence and not to disclose any such Confidential Information to any third party absent express written consent by Consignee. Any violation of the terms, conditions and covenants shall result in Consignee's right to immediately terminate this Agreement and assert a Claim against Consignor for any Losses suffered.

28. The Parties do not intend to form a partnership or joint venture, principal-agent, employer-employee, or any other relationship other than that of consignor-consignee, and, where appropriate, licensor-licensee. It is fully understood that each Party will exercise full power and authority, except as specifically provided otherwise in writing and signed by both Parties, to select the means, method and manner of performing all obligations required under this Agreement. Except as provided herein, neither Party will have any right or authority and will not attempt to enter into any contract or commitment, or incur any debt or liability of any nature in the name of or on behalf of the other Party.

29. Upon Consignor's reasonable request, Consignee shall, at its sole cost and expense, execute and deliver all such further documents and instruments, and take all such further acts, as reasonably necessary to give full effect to this Agreement, including but not limited to, information about Consignee's new and existing store locations as necessary to file any applicable financing or security filings.

30. No Party hereto shall be liable or responsible to the other Party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or

performing any term of this Agreement, when and to the extent the failure or delay is caused by or results from acts beyond the impacted Party's reasonable control, including the following force majeure events: (a) acts of God; (b) flood, fire, earthquake or explosion; (c) war, invasion, hostilities, terrorist threats or acts, riot or other civil unrest; (d) requirements of applicable law; (e) actions, embargoes or blockades in effect on or after the date of this Agreement; (f) action by any governmental authority; (vii) national or regional emergency; (g) strikes, labor stoppages or slowdowns or other industrial disturbances; and (h) shortage of adequate power or transportation facilities.

31. This Agreement sets forth the Parties' final and entire understanding with respect to its subject matter, cannot be changed, waived or terminated orally and shall be governed by and construed under the laws of the state of Ohio (without reference to its rules as to conflicts of law). If any provision shall be held invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not affect or render invalid or unenforceable any other provision of this Agreement.

32. This Agreement is binding on and inures to the benefit of the Parties to this Agreement and their respective permitted successors and permitted assigns.

33. The Parties agree that any dispute concerning this Agreement shall be brought in a court of competent jurisdiction in the state or federal courts sitting in Summit County, Ohio and each Party hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts. Each Party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

34. Unless otherwise provided herein, all notices, requests, consents, Claims, demands, waivers and other communications required under this Agreement (each, a "Notice") must be in writing and addressed to the attention of the authorized signatories below at the address of their respective principal offices set forth above, in the case of Consignor, or on Exhibit A (or to such other address that the receiving Party may designate from time to time in accordance with this paragraph 34) with a copy to the General Counsel as set forth on Exhibit A, in the case of Consignee. All Notices must be delivered by personal delivery, nationally recognized overnight courier or certified or registered mail, email or by other mutually agreed upon means. Except as otherwise provided in this Agreement, a Notice is effective only (a) on receipt by the receiving Party, and (b) if the notifying Party has complied with the requirements of this paragraph 34.

35. This Agreement may be executed in any number of counterparts and by different Parties hereto on separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute one and the same Agreement.

36. Consignor shall comply with all applicable laws, rules, and regulations of any type that apply to any aspect of activities in connection with this Agreement, including, without limitation, those dealing with: (a) the procurement, sale, delivery, distribution, performance, or servicing of the Consigned Merchandise; (b) tax, foreign exchange, economic and currency controls; and (c) corruption and bribery, including, without

limitation, money laundering, terrorism, commercial bribery, or bribing or otherwise improperly dealing with Government Officials. "Government Official" means any officer, employee, or person acting in an official capacity for or on behalf of: (x) a government; (y) a public international organization (such as the World Bank and the International Monetary Fund); or (z) any department, agency or instrumentality of a government or public international organization.

Consignor understands that Consignee's business practices prohibit bribery and corrupt behavior in any form. Consignor shall not offer, pay, or provide anything of value (including money) in the form of a bribe, gratuity or other inducement, either directly or indirectly, to any Government Official for the purpose of influencing or attempting to influence any act or decision. Such activity is prohibited even if the activity appears customary or consistent with prevailing business practices. Consignor represents that it has not made any improper payments to a Government Official in connection with efforts to obtain or retain business, including, without limitation, efforts to obtain or retain Consignee's business or to procure any part of the Consigned Merchandise on behalf of Consignee. Promptly upon request, Consignor will certify in a written form acceptable to Consignee that Consignor has complied with this section and will permit Consignee to inspect Consignor's books and records to ensure compliance.

WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

Consignor:

**UNIQUE DESIGNS, INC.**
**d/b/a Kiran Jewels, SDIL**
**Interjewel USA and/or Mercury**
**Ring**

By: _____
Name: Amit Mehta
Title: VP

Consignee:

**STERLING JEWELERS INC.**

By: _____
Stash Ptak
Its: Vice President and Assistant Secretary

**STERLING INC.**

By: _____
Stash Ptak
Its: Vice President and Assistant Secretary

**ZALE DELAWARE, INC.**

By: _____
Stash Ptak
Its: Vice President and Assistant Secretary

**TXDC, L.P.**

By: Zale Delaware, Inc.
Its: Managing Partner

By: _____
    Stash Ptak
Its: Vice President and Assistant
    Secretary

**ZALE CANADA CO.**

By: _____
    Stash Ptak
Its: Vice President and Assistant
    Secretary

## Exhibit A

## Consignee Entities

**"Sterling Entities":**
- **Sterling Jewelers Inc.,** a Delaware corporation with an address at 375 Ghent Road, Akron, OH 44333

- **Sterling Inc.,** an Ohio corporation with an address at 375 Ghent Road, Akron, OH 44333

**"Zale Entities":**
- **Zale Delaware, Inc.,** a Delaware corporation with an address at 9797 Rombauer Rd., Suite 100, Dallas, TX 75019

- **TXDC, L.P.,** a Texas limited partnership with an address at 9797 Rombauer Rd., Suite 100, Dallas, TX 75019

- **Zale Canada Co.,** a Canadian corporation with an address at 9797 Rombauer Rd., Suite 100, Dallas, TX 75019

Copies of all notices hereunder shall be directed to the following:

[Consignee Entity]
c/o Signet Jewelers
375 Ghent Road
Akron, Ohio 44333-4600
Attention: General Counsel

## Purchase Related Agreements

Pursuant to Section 1, the following agreements are incorporated by reference:

Vendor Buying Agreement between the Consignor and any or all of the Consignees, as may be amended.